**Joshua Carson, MD, FACS**

702 NE 11th Ave
Gainesville, FL 32601

March 10, 2019

Brian T. Maye
Tara Shelke
ADLER MURPHY & McQUILLEN LLP
20 South Clark Street, Suite 2500
Chicago, Illinois 60603

    Re:    ***Vanessa Newport v. Frontier Airlines, Inc.***
               Case No.: 6:18-cv-00536-Orl-18GJK

Mr. Maye:

    I had the opportunity to perform an independent medical evaluation on Vanessa Newport on Tuesday, March 5, 2019 in Orlando, Florida. Ms. Newport came to the evaluation at the appointed time, accompanied by her husband. Also present for this encounter was a videographer, provided by Ms. Newport's counsel. For this in-person component of the evaluation, I asked Ms. Newport a series of questions pertaining to her injury, symptoms, treatment, and pertinent medical history. In addition to this in-person assessment, I reviewed the following records:

1. Plaintiff's Complaint

2. November 13, 2018 deposition of Vanessa Newport

3. Medical records for patient Vanessa Newport provided by defense counsel, including:

    a. Records from Munroe Regional Medical Center;
    b. Records from Express Care of Ocala;
    c. Records from Central Florida Cancer and Blood Center

4. Photographs of injury taken by Vanessa Newport provided by defense counsel.

**EXHIBIT E**

**HISTORY (AS COMPILED FROM PATIENT INTERVIEW AND REVIEW OF RECORDS):**

Burn Injury

Ms. Newport reports that she incurred burn injuries on February 14, 2016 onboard a flight from Las Vegas to Orlando when a cup of hot water (for tea) spilled onto her lap mid-flight. Of note, she recalls that the pants she was wearing at the time were made from a cotton-synthetic blend fabric, and her underpants (in the area where she later identified her burns) were made from cotton. She reports that she felt intense pain from the hot water in her lap and on her seat. She reports that a flight-attendant tried to help her out by blotting up the water with paper towels. She states that she asked the flight attendant to hold off so that she could get out of her seat. She did not go to the lavatory to change clothes. The flight-attendant finished mopping up the excess water in the seat. Ms. Newport stood in the aisle for a bit, and then sat back down and remained seated for the rest of the flight. While she reports that there was intense pain on contact from the hot water, she reports that she did not notice much pain for the rest of the flight.

Upon landing and deplaning, several hours after the spill, Ms. Newport went to change her clothes in a restroom in the airport. This was when she was first able to see her burn sites (in part), and she reports noticing redness on her thighs. She reports that the injuries were still not particularly painful at this time. She was picked up by her husband at the airport, and elected to go to a restaurant for dinner at this time. When she got home later that evening, she noticed some blistering on her thighs upon changing. She looked on the internet for information on burn management, and began placing gauze and bandages over the affected areas to keep them clean and (possibly) applying some over-the-counter topical treatment. She did not seek professional medical attention.

Ms. Newport notes that her burns did not cause her significant pain in the week following injury. (She notes that she understands this absence of pain was caused by nerve damage from the burns.) Ms. Newport reports that she went to her primary care physician (Frank Reisner, MD) ten days following her burn injury (on 2/24/2016) to evaluate her burn out of concern that the injuries were not healing as she expected. (Of note, the physician's documentation reports that her primary reason for this visit was to address an ongoing cough.) Dr. Reisner identified healing second degree burns at upper thighs and buttocks and first degree burns on left thigh. For treatment of these burns, he prescribed Silvadene cream and Tylenol with Codeine.

Ms. Newport followed up with Dr. Reisner about one week later. He described her burns as "healing well" along the thigh and "healing slowly" at the buttocks. At this point, Dr. Reisner referred her for hydrotherapy for further treatment of her wounds. Records from her initial evaluation at Munroe Medical Center Hydrotherapy on 03/04/2016 document three wounds measuring 2cm x 1cm, 2cm x 1cm, and 4cm x 1.5cm. Her pain at the wound sites is rated as "4/10 or less." In the notes documenting the hydrotherapy treatments, the wound therapist answers "No" to the prompt/question "Pain is present and interferes with treatment." Her course of hydrotherapy treatments was abandoned after a

few treatments when she was admitted to hospital for inpatient management of a DVT (discussed below).

On my interview, Ms. Newport reports that her burns have been causing her marked pain and discomfort since 2016. She states that it makes it painful for her to sit in place, such that she cannot sit in place for extended periods of time without needing to shift positions or get up from sitting repeatedly. She describes paresthesias (painful "tingling") at the wound sites as well as hypersensitivity. She also complains of unsightly scaring from the injuries.

On review of Ms. Newport's medical records, I see very little mention of these symptoms after March 2016. She presented to her primary care clinic multiple times for a variety of aches, pains, and maladies. Over the course of over two years (from 04/2016 through 04/2018), her primary care clinic documented complaints of dysuria, cough, back pain, bone pain, and shoulder pain. However, only once (on 02/18/2017) during this time period do I see mention of a complaint of pain or discomfort at her burn sites - the practitioner notes as a secondary complaint that "She also complains of paresthesias in legs where she previously had burns." Of particular interest, symptoms from her burns do not show up in any of the "Review of Symptoms" sections of her medical notes over this period. ("Review of Systems" refers to a process by which the physician checks for any symptoms the patient has not thought to mention on their own by asking a series of questions that screen for symptoms in a wide range of areas.)

DVT

On March 16, 2016, Ms. Newport developed non-specific symptoms of feeling "not well" and chest-pains, prompting her to present to Dr. Reisner for evaluation. Dr. Reisner identified an elevated D-Dimer on bloodwork, prompting him to refer Ms. Newport for a series of tests, including an ultrasound of the lower extremity which identified a deep venous thrombosis (DVT) in the proximal left femoral vein. The rest of the vein and system was patent. V/Q scan showed no indication of pulmonary embolism. She was admitted to Munroe Regional Medical Center for management of her DVT. While Ms. Newport repeatedly states that she was placed on "bed-rest" on admission, I do not see any such orders in the records I reviewed, nor do I see any medical reason why such limitation would be prescribed for a simple DVT. She was discharged home upon conversion from intravenous to oral medication for treatment of her DVT.

During this admission, a hematology consult was provided by Dr. Ravi Koti. After reviewing the patient's history and evaluating, he noted his initial impression that this embolism "appears to be spontaneous." A battery of tests were ordered on Dr. Koti's recommendation in search of any potential underlying risk-factors or coagulation disorders that may have contributed to Ms. Newport's DVT formation.

As an outpatient, Ms. Newport was treated with a six-month course of oral anticoagulation to encourage resolution and prevent recurrence of her DVT. She returned to the emergency room on 03/22/2016 with concern for a possible recurrent or

progressive DVT due to symptoms of shortness of breath and leg tingling. Ultrasound at this time showed complete resolution of the previously diagnosed left femoral DVT. In November 2016, a final ultrasound of the lower extremity confirmed persistent resolution of the DVT.

On outpatient follow up, Dr. Koti (hematology) noted that Ms. Newport's coagulopathy identified abnormally low levels of Antithrombin III (ATIII). As an ATIII deficiency would cause hypercoagulability (a condition where the blood clots more than it should), Dr. Koti recommended further testing to confirm and better characterize Ms. Newport's disorder. According to his notes, Ms. Newport repeatedly refused this recommended testing despite Dr. Koti's repeated recommendation.

**PHYSICAL EXAMINATION:**

On physical exam, Ms. Newport is a pleasant and cooperative adult female appearing her stated age. She is well groomed and in no acute distress. Her thought processes are linear, and she does not demonstrate any frank signs of confusion, cognitive delay, or delirium.

During the entirety of our interview I did not note that Ms. Newport showed any difficulty sitting still or maintaining a seated position. She did not seem to need to stand up at any point in time for comfort reasons. I did not notice any tendency to shift her weight from side to side with any frequency that would indicate difficulty maintaining a comfortable sitting position.

Scar Exam

In terms of her scars, I had the opportunity to inspect her scars close up. On her left thigh she had a very faint area of hypopigmentation that was only really evident on up-close inspection. There was no evidence of hypertrophic scar, keloid or scar contracture, and there were not areas of open skin or breakdown.

I could not appreciate any visible scars on her inner thighs.

Examination of her posterior identified symmetric areas of faint hyperpigmentation on the inferior-medial aspect of each buttock. These were approximately 1cm x 2cm each. There is no hypertrophic scar, scar contracture, open area, or contour defect.

Left lower extremity exam (re DVT history)

Her lower extremities were symmetric. There was no evidence of unilateral swelling on the left. There were no prominent varicosities, nor did she exhibit signs of chronic-venous-stasis changes beyond normal age-related changes.

**ASSESSMENT AND CONCLUSIONS:**

Mechanism of Injury

The mechanism reported by Ms. Newport of spilling hot water onto her lap is certainly capable of creating a burn injury. Pertinent factors present include the clothing she wore, the fluid involved (water), and her immediate care of the area.

That the liquid that burned her was water is to her advantage as it evaporates rapidly and easily. Unlike hot oils or creams, water does not stick to the skin and does not continue to burn for long periods of time. As water evaporates, it rapidly cools.

Her injury was also mitigated by the fabrics she was wearing. She described the pants she was wearing as breathable polyester fabric. There is no report of this fabric melting and adhering to her skin. In the area of the buttock burns, the skin was covered with a breathable cotton layer. These fabrics would have allowed for the process of evaporation to proceed, with resultant cooling.

It is notable that Ms. Newport did not take any measures to cool off these injuries initially. It is generally recommended that one cools small burns (such as these) to temperatures at or slightly below room body temperature as soon as possible. This can easily be accomplished by a brief rinse in tepid-to-cool water or, at least, by simply removing any heated clothing and allowing to cool by air-convection. Ms. Newport's failure to do so may have resulted in the injury being larger and deeper than it would have been had she cared for it appropriately. Having said that, the utility of such cooling measures is limited to the brief period of time immediately following the injury. After several minutes, the water would have cooled to temperatures well below burning. After a few minutes had passed, she did not further the severity of the burns by remaining in her seat for the duration of the flight.

Description of Injury

I would characterize the injuries Ms. Newport incurred on February 14, 2016 as first and second-degree burns using classic terminology. Using the more recent nomenclature, I would describe these injuries as principally superficial-partial-thickness burns with small areas of deep-partial-thickness injury. I based this description on the reported mechanism of injury, her medical records, the pictures provided, and my physical exam of the areas in their current state. The photo documentation of the wounds provided in conjunction with the current status of her wounds make it clear that she did not have any full thickness a.k.a. third-degree burns.

The one aspect of the case as presented that is inconsistent with this assessment (i.e., not consistent with the rest of the data provided) is the patient's report of the time-course of her pain symptoms. She describes the wounds as excruciatingly painful on immediate injury, then essentially painless from the time she landed in Orlando until her encounter with Dr. Reisner over one week later. She then describes the development of

marked pain later in the course of recovery that she reports as persistent to the present day. This is not consistent with the small, partial-thickness injuries she sustained. For the injuries to have been painless within the first 48 hours of injury, they would have needed to be full-thickness burns, destroying the entirety of the sensory-innervated layer skin involved. Such injuries can result in a lack of pain (or any sensation) initially, followed by progressive neuropathic pain as the nerve-endings regenerate and repair over the ensuing months. The pictures provided show pink, living tissue at the surface of these wounds, which indicates intact nerve endings. Furthermore, injuries of sufficient depth to cause such a symptom pattern would be too deep to heal as cleanly as her injuries have healed. Full-thickness burns can only heal by gradual pulling together of the edges to close the gap in between. One would expect that such a process would result in permanent scar contractors that would be evident on physical exam to this day. I see no such scarring patterns at the site of any of the injuries described.

Management and Treatment of Wounds

While Ms. Newport's failure to seek medical attention shortly after the injury certainly did not help of the course of her burn wounds, it is hard to say whether or not it had a negative impact on her recovery. It is certainly advisable to consult with a physician within a few days of an injury. Having said that, the biggest benefit to seeking early medical attention for superficial burns, such as those incurred by Ms. Newport, is derived from interventions aimed at preventing infection, and I do not see any evidence suggesting a wound infection in these injuries. Short of preventing infection and minimizing pain through high-quality dressings and medical analgesia, early medical care for superficial burns such as these is not essential to heal such wounds.

A Note on the Patient's Hydrotherapy Treatment

Ms. Newport states that her hydrotherapy treatment was aborted because she had to be admitted to the hospital. Although the hydrotherapy may have been somewhat helpful in expediting healing, but it is by no means essential for treatment of such wounds. Given the documented description of her wounds and the pictures she provided, were Ms. Newport to have presented to my care for such wounds, I would not have treated with hydrotherapy. Ms. Newport's statement that her hydrotherapy had to be aborted due to her need for a hospital admission for DVT management is misleading. On admission to hospital, if her physicians deemed hydrotherapy to be an essential component of her care, they would have been obligated to transfer her care to a hospital with an inpatient burn center. They could have easily transferred her to the regional burn center at a hospital located within an hour of the hospital where she was admitted, where a complete range of therapies would have been available to utilize in treatment simultaneous with her treatment for the DVT. The fact that she did not receive hydrotherapy after hospital admission for her DVT is an indication that the hospital determined that such therapy was not necessary.

**EXHIBIT E**

Prognosis and Anticipated Sequelae

As to the prognosis of these injuries in the context of proper medical treatment, there is a period of pain for days to weeks followed by a complete healing with variable degrees of scarring depending upon the patient's skin factors and depth of the injury. In Ms. Newport's case, the sequelae appear to be minimal. Examination of her scars indicates complete healing with very minimal scarring.

Given the status of the wounds on my examination on March 5, 2019, I think the long-term impact of these injuries is negligible.

It should be noted that there is no role for surgical treatment of these wounds at this point in time, nor do I anticipate the need for any such treatment in the future. I know the patient mentions that she has been given reason to believe that she may require surgery in the future related to a potential skin graft. I see absolutely no indication for skin grafting of these wounds as they are already healed and the scarring expecting the skin graft would likely be significantly more morbid and problematic than the minimal scarring she has now.

DVT

On March 17, 2016, Ms. Newport was diagnosed with a deep venous thrombosis located in the proximal portion of her left femoral vein. It is my opinion that this diagnosis most likely represents an incidental finding. The development of the DVT was not at all related to her burn injury.

I describe this diagnosis as an incidental finding, because it does not account for any of the symptoms prompting its discovery. The ultrasound that identified Ms. Newport's DVT was prompted by a complaint of chest pain for one day. The motivation for obtaining such an ultrasound was to rule out a possible pulmonary embolism. After identifying the clot in her vein, her physicians obtained a V/Q scan to search for more direct evidence of a pulmonary embolism. The scan was negative.

As to the connection between the clot and her burn, there is no connection. It should be noted that, anatomically, the clot is completely separate from the areas of burn. The patient's burn is in the superficial aspect of her skin. A deep venous thromboembolism is by definition located in the deep venous system. This lays many layers below the skin, underneath the skin, fat, and soft tissue below the burn. Furthermore, Ms. Newport's DVT was located in the proximal femoral vein, an area that is far higher up in the thigh than the area where she was burned.

As to the suggestion that Ms. Newport's decreased mobility as a result of the burns somehow led to the formation of the DVT, I find this highly implausible. Patients with severe tremors are at risk for thromboembolism. This is generally attributed to their prolonged immobility, needing to stay in bed recumbent, and not moving at all for days on end. Here, Ms. Newport reports that the burns were not particularly painful immediately

after injury. As to the discomfort she experienced later, causing her to have difficulty sitting, these symptoms would not be expected to increase her risk for thromboembolism. Ms. Newport describes being bothered by difficulties with sitting for prolonged periods, requiring her to frequently stand up and/or shift positions for comfort. This is exactly the kind of mobility that we typically recommend for patients to avoid thromboembolism. So Ms. Newport's description of actively moving, and her statements that she continued to go to work after the incident, is clear evidence that she was not immobile, and her risk for thromboembolism did not increase due to any immobility.

Ms. Newport's blood work identified a relative deficiency in Antithrombin III (ATIII). ATIII helps the blood prevent or dissolve clots. An ATIII deficiency, therefore, makes a patient's blood more prone to forming clots. This deficiency, rather than the burn, likely contributed to the development of her DVT.

Joshua Carson, MD, FACS

**Additional references utilized in forming this opinion:**

1. American Burn Association. Advanced Burn Life Support Provider Manual. 2016. American Burn Association, Chicago, IL.

2. Mlcak RP, Buffalo MC, Jimenez CJ. Prehospital Management, Transportation, and Emergency Care. In: Herndon DN, ed. *Total Burn Care*, 5th ed. 2018. Elsevier.

3. Voigt CD, Celis M, Voigt DW. Care of Outpatient Burns. In: Herndon DN, ed. *Total Burn Care*, 5th ed. 2018. Elsevier.

4. Jandera V, Hudson DA, de Wet PM, Innes PM, Rode H. Cooling the burn wound: evaluation of different modalities. *Burns*, 2000. 26 (3):265-270.

5. Tredget EE, Levi B, Donelan MB. Biology and Principles of scar management and burn reconstruction. *Surg Clin North Am*, 2014. 94(4):793-815.

6. Shupp JW, Nasabzadeh TJ, Rosenthal DS, et al. A review of the local pathophysiologic bases of wound progression. *J Burn Care Res*, 2010. 31(6):849-873.

7. Brownson EG, Gibran NS. Evaluation of the Burn Wound: Management Decisions. In: Herndon DN, ed. *Total Burn Care*, 5th ed. 2018. Elsevier.

8. Hawkins HK, Jayson J, Finnerty CC. Pathophysiology of the Burn Scar. In: Herndon DN, ed. *Total Burn Care*, 5th Edition. 2018. Elsevier.

**EXHIBIT E**