# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

VANESSA NEWPORT,

        *Plaintiff,*

v.                                     Case No.: 6:18-cv-536-Orl-18GJK

FRONTIER AIRLINES, INC.,             District Judge G. Kendall Sharp
                                       Magistrate Judge Gregory J. Kelly

        *Defendant*

_____/

## JOINT FINAL PRETRIAL STATEMENT

Plaintiff VANESSA NEWPORT ("Plaintiff") and Defendant FRONTIER AIRLINES, INC. ("Defendant"), each by their undersigned counsel, submit this Joint Final Pretrial Statement pursuant to this Court's Case Management and Scheduling Order (Doc. #15) and Middle District of Florida Rule 3.06, and state as follows:

1.    ***Basis for federal jurisdiction:***

Plaintiff is an individual and is a citizen of Florida. Defendant is a corporation incorporated in Colorado and with its principal place of business in Denver, Colorado. Thus, there is complete diversity among the parties. Plaintiff alleges negligence against Defendant and asserts that the amount in controversy exceeds $75,000, exclusive of interest and cost. Therefore, jurisdiction is conferred upon this Court pursuant to the provisions of 28 U.S.C. §§ 1332, 1441, and 1446.

2.    ***Concise statement of the nature of the action:***

Plaintiff's negligence action against Defendant arises out of an incident, which occurred on February 14, 2016, onboard Frontier Flight 1220 from Las Vegas, Nevada to Orlando,

Florida. Plaintiff requested hot tea during inflight service and was served a cup of hot water closed with a lid, and a teabag and sugar on the side. Plaintiff spilled the liquid on herself when she took the lid off the cup to prepare the tea, which resulted in her alleged injuries.

3.    *Brief, general statement of each party's case:*

   a.    **PLAINTIFF:**

Plaintiff purchased a ticket from Defendant to fly on Defendant's aircraft from Las Vegas, Nevada, to Orlando, Florida, on or about February 14, 2016, on flight number F91220.

At all times material to this action, Defendant employed, retained, gave authority to, or contracted with various persons and businesses to perform various functions and provide various services on the aircraft, including food and beverage service.  In the alternative, the people and businesses who performed functions and provided services were held out to the public and Plaintiff as being the apparent agents, servants and employees of Defendant.  At all times material to this action, the employees, agents, servants, or personnel were acting within the course and scope of their agency or employment thereby rendering Defendant liable for their acts and omissions.

During the flight to Orlando, Plaintiff ordered a hot tea, believing she would be served a pre-made hot tea. Instead, Defendant's employees, agents, servants, or personnel negligently served Plaintiff a cup of scalding hot water and an unused tea bag so that Plaintiff had to make her own tea.

Defendant failed to warn Plaintiff of the dangerously high temperature of the hot water. Furthermore, Defendant failed to warn Plaintiff of any oncoming turbulence that would interfere with Plaintiff's ability to safely make her tea.

As she tried to make her own tea with the scalding water, the aircraft hit turbulence and the water spilled on Plaintiff's lap, causing severe burns and permanent scarring. Plaintiff was unable to get proper medical attention to address her severe burns until the flight landed hours later.

**b.    DEFENDANT:**

There is no dispute that Plaintiff requested hot tea during inflight service, that Plaintiff was served a cup of hot water closed with a lid, and a teabag and sugar on the side, that Plaintiff accepted the cup from the flight attendant and placed it on her tray table, and that Plaintiff spilled the contents of the cup on herself after she took the lid off the cup. Plaintiff has no evidence, other than her own speculation, that the subject flight encountered any kind of turbulence.

Plaintiff contests the manner in which Defendant served her tea; she asserts Defendant should have served her a pre-made tea. But, at the time of the incident (and currently), there were no federal regulations which required air carriers to serve passengers pre-made hot beverages. Plaintiff's claim is preempted by the Airline Deregulation Act of 1978. There is no evidence that Defendant breached any applicable standard of care or that Defendant was the cause of her alleged injuries. There is also no evidence that the subject incident caused Plaintiff's alleged deep vein thrombosis ("DVT").

*4.    List of all exhibits and Rule 5.04 exhibit substitutes to be offered at trial with notation of all objections thereto:*

The Parties attach their Joint Exhibit List as Exhibit A.

*5.    List of all witnesses who may be called at trial:*

**a.    PLAINTIFF:**

*See* attached Exhibit B.

**b.     DEFENDANT:**

*See* attached Exhibit C.

6.     ***List of all expert witnesses included, as to each such witness, a statement of the subject matter and a summary of the substance of his or her testimony:***

**a.     PLAINTIFF:**

Plaintiff does not have any expert witnesses.

**b.     DEFENDANT:**

1)     Dr. Joshua Carson, MD, FACS: Dr. Carson will testify to all subjects discussed in his March 15, 2019 written report, attached as Exhibit D.

7.     ***In cases in which any party claims money damages, a statement of the elements of each such claim and the amount being sought with respect to each such element:***

**a.     PLAINTIFF:**

| | |
|---|---|
| Munroe Regional Medical Center | $23,503.81 |
| Central Florida Cancer & Blood Center | $ 1,500.00 |
| Express Care of Ocala | $ 3,538.12 |

**b.     DEFENDANT:**

Defendant is not taking a claim for money damages.

8.     ***List of all depositions to be offered in evidence at trial (as distinguished from possible use for impeachment), including a designation of the pages and lines to be offered from each deposition:***

1)     Plaintiff Vanessa Newport;

2)     Danny Newport;

3)     Jennifer Newport Balitz;

4)     Frank F. McKinney.

9.     ***Concise statement of those facts which are admitted and will require no proof at trial, together with any reservations directed to such admissions:***

**a.     The Parties agree to the following facts:**

1)      Plaintiff was a passenger on Frontier flight 1221 from Las Vegas, Nevada to Orlando, Florida on February 14, 2016.

2)      To enhance a passenger's flying experience, Defendant offers beverage service, which includes hot tea and coffee.

3)      During the flight, Plaintiff requested hot tea. The flight attendant asked if Plaintiff wanted to be provided cream and sugar to add to her tea. Plaintiff responded she only wanted sugar. The flight attendant handed Plaintiff a cup of hot water closed with a lid, and a teabag and sugar on the side.

4)      Plaintiff accepted the cup from the flight attendant and placed it in the cup holder on her tray table, which she had already placed in the down position.

5)      Pursuant to Defendant's policies regarding service of hot beverages, the flight attendant was required to offer Plaintiff condiments, a napkin, a stir stick, and a lid for her tea, which she did.

**b.      Defendant maintains that the following additional facts are admitted insofar as Plaintiff did not dispute them in her Response to Defendant's Motion for Summary Judgment (Doc. #35) and did not conduct any written discovery or oral discovery and did not retain any expert witnesses, and therefore, has no evidence to contradict these facts:**

1)      Defendant does not serve pre-made beverages because passengers prefer to prepare their own beverages, allowing passengers to prepare beverages to their liking is industry standard, and Defendant would not have the staff, time, or resources to carry out pre-made beverage service.

2)      The cup handed to Plaintiff was insulated. Plaintiff does not remember the cup feeling hot to touch.

3)     After Plaintiff placed the cup of hot water on her tray table, she took the lid off the cup, and "then something jerked and then it just - [she] lost control of it and it came, you know, flying and pouring into [her] lap."

4)     Pursuant to both Defendant's policies and industry standards, the flight attendant was not required to serve Plaintiff pre-made hot tea.

5)     At the time of the subject flight, and currently, there were no federal regulations that required Defendant to serve Plaintiff a hot beverage in a cup closed with a lid.

6)     At the time of the subject flight, and currently, there were no federal regulations that required Defendant to serve Plaintiff pre-made hot tea.

7)     At the time of the subject flight, and currently, there were no federal regulations that prohibited Defendant from serving hot tea by providing passengers with a cup of hot water, and a tea bag and requested condiments on the side.

8)     When Plaintiff was served her beverage, the subject flight was not experiencing turbulence. The fasten seatbelt sign had been turned off and passengers were informed they could get out of their seats and move about the cabin. Plaintiff characterized this portion of the subject flight as "smooth sailing."

9)     Prior to and during the subject flight, Defendant did not possess, and was not aware of, any information indicating that a weather system, weather cell, or weather condition, which may cause turbulence, was located in, or anticipated to be located in, the flight path of the subject flight. Defendant did not receive any reports during or after the subject flight that the flight experienced any kind of turbulence, including light turbulence.

10)    Industry standards permit beverage service during light turbulence.

11)    Defendant's policies permit beverage service during light turbulence.

12)    At the time Plaintiff was served her hot beverage, there were no flight conditions that required hot beverage service to be delayed, discontinued, intermittently stopped, or terminated.

13)    On February 24, 2016, ten days after the incident, Plaintiff sought medical treatment from her primary care physician, Dr. Frank Reisner, for a cough and skin discomfort from the hot water spill. Dr. Reisner diagnosed Plaintiff with first and second degree burns and prescribed hydrotherapy. Plaintiff attended hydrotherapy from March 4, 2016 until March 17, 2016. She was discharged from hydrotherapy on March 17, 2016 and received no further treatment related to the burns.

14)    On March 16, 2016, approximately one month after the subject flight, Plaintiff was treated by Dr. Reisner for persistent chest pain. At that visit, Dr. Reisner recommended Plaintiff be examined by the emergency department at Munroe Regional Medical Center ("Munroe"). While being treated at Munroe, an ultrasound of Plaintiff's left lower extremity showed DVT within her proximal left femoral vein.

15)    Dr. Ravi Koti, a board certified hematologist, treated Plaintiff for the DVT.

16)    On March 22, 2016, a repeat ultrasound of Plaintiff's left lower extremity showed no evidence of DVT.

17)    On November 9, 2019, a second repeat ultrasound showed no evidence of DVT.

18)    Further testing by Dr. Koti showed complete resolution of the DVT.

19)    On March 5, 2019, Dr. Carson performed an independent medical evaluation on Plaintiff.

20)     Dr. Koti, Plaintiff's own treating physician, has opined that Plaintiff's DVT was not caused by the hot water spill on the subject flight.

21)     Dr. Carson has also opined that Plaintiff's DVT was not caused by the hot water spill on the subject flight.

**10.    *Concise statement of applicable principles of law on which there is agreement:***

1)     A negligence claim has four elements: (1) a duty by defendant to conform to a certain standard of conduct; (2) a breach by defendant of that duty; (3) a causal connection between the breach and injury to plaintiff; and (4) loss or damage to plaintiff.

2)     There is no duty to warn of obvious dangers.

3)     In a negligence action, contributory fault and assumption of risk chargeable to the plaintiff diminish proportionately the amount awarded as economic and noneconomic damages for an injury attributable to the plaintiff's contributory fault, but does not bar recovery.

**11.    *Concise statement of those issues of fact which remain to be litigated (without incorporation by reference to prior pleading and memoranda):***

1)     Whether Defendant was negligent in the manner in which it served Plaintiff hot tea, i.e., serving her a cup of hot water closed with a lid with a teabag and sugar on the side, requiring her to take the top off the cup to make her own tea.

2)     Whether the water Defendant served Plaintiff was hotter than the law allows.

3)     Whether the subject flight encountered turbulence.

4)     The facts identified in Section 9(b) above, if not deemed admitted by this Court.

**12.    *Concise statement of those issues of law which remain for determination by the Court (without incorporation by reference to prior pleadings or memoranda):***

None.

13. **Concise statement of any disagreement as to the application of the Federal Rules of Evidence or the Federal Rules of Civil Procedure:**

None.

14. **List of all motions or other matters which require action by the Court:**

1) On June 7, 2019, Defendant filed its Motion for Summary Judgment (Doc. #33);

2) On August 20, 2019, the parties will file their Motions *in Limine*;

3) The parties' Proposed Jury Instructions, attached as Exhibit E;

4) The parties' Proposed Verdict Form, attached as Exhibit F.

15. **Signature of counsel for all parties:**

Date: July 30, 2019                                    Respectfully Submitted,

**VANESSA R. NEWPORT**                     **FRONTIER AIRLINES, INC.**

*/s/ Christina Figueroa*                            */s/ Tara Shelke*

Christina Figueroa (FBN: 120248)          Brian T. Maye (admitted *pro hac vice*)
HOGAN LAW                                          Tara Shelke (admitted *pro hac vice*)
5626 Curry Ford Road, Suite 100            ADLER MURPHY & McQUILLEN LLP
Orlando, Florida 32822                            20 South Clark Street, Suite 2500
Phone: (407) 377-0700                            Chicago, Illinois 60603
Email: christina@hoganpa.com                Phone: (312) 345-0700
                                                            Email: bmaye@amm-law.com
**Attorney for Plaintiff Vanessa Newport**                  tshelke@amm-law.com

                                                            -And-

                                                            Dennis R. O'Connor (FBN: 376574)
                                                            Derek J. Angell (FBN: 73449)
                                                            O'CONNOR & O'CONNOR, LLC
                                                            800 North Magnolia Avenue, Suite 1350
                                                            Orlando, Florida 32803
                                                            Phone: (407) 843-2100
                                                            Email: doconnor@oconlaw.com
                                                                       dangell@oconlaw.com

                                                            **Attorneys for Defendant**
                                                            **Frontier Airlines, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2019, I caused the foregoing to be electronically filed with the United States District Court for the Middle District of Florida, Orlando Division, using the CM/ECF System.

By: /s/ *Tara Shelke*
One of the attorneys for Defendant
FRONTIER AIRLINES, INC.
ADLER MURPHY & McQUILLEN LLP
20 South Clark Street, Suite 2500
Chicago, Illinois 60603
Phone: (312) 345-0700
Email: bmaye@amm-law.com
         tshelke@amm-law.com



# EXHIBIT LIST

_____ Government      X  Plaintiff      X  Defendant      _____Court

Case No.      6:18-cv-536-Orl-18GJK

Style:      Vanessa Newport v. Frontier
            Airlines, Inc.

| Exhibit No. | Date Identified | Date Admitted | Sponsoring Witnesses | Objections / Stipulated Admissions[1] | Description of Exhibit |
|---|---|---|---|---|---|
| 1 | 7/18/19 | | Defendant | * | Still from 03.05.2019 medical exam video |
| 2 | 7/18/19 | | Defendant | * | Plaintiff flight confirmation [PLTF000001] |
| 3 | 7/18/19 | | Defendant | * | 02.23.2016 Plaintiff email [PLTF000387-000388] |
| 4 | 7/18/19 | | Defendant | * | Safety Assurance System: Operations - Cabin Safety [16AZF0216 NEWPORT FRONTIER 000001-000060] |
| 5 | 7/18/19 | | Defendant | * | Air Carrier Operations Bulletin [16AZF0216 NEWPORT FRONTIER 000061] |
| 6 | 7/18/19 | | Defendant | * | Frontier Flight Attendant Manual section - turbulence [16AZF0216 NEWPORT FRONTIER 000062] |
| 7 | 7/18/19 | | Defendant | * | Frontier Flight Attendant training materials[16AZF0216 NEWPORT FRONTIER 000063-000108] |
| 8 | 7/18/19 | | Defendant | * | Frontier video [16AZF0216 NEWPORT FRONTIER 000064] |
| 9 | 7/18/19 | | Defendant | * | Opening FlyTab video [16AZF0216 NEWPORT FRONTIER 000105] |
| 10 | 7/18/19 | | Defendant | * | Making sales video[16AZF0216 NEWPORT FRONTIER 000106] |
| 11 | 7/18/19 | | Defendant | * | Initial Service [16AZF0216 NEWPORT FRONTIER 000110] |
| 12 | 7/18/19 | | Defendant | * | Closing FlyTab video[16AZF0216 NEWPORT FRONTIER 000107] |

[1]Use a code (e.g. "A"or "*") in this column to identify exhibits to be received in evidence by agreement without objection. Otherwise, specifically state each objection to each opposed exhibit. Please note that each date box on the left must be one inch wide to accommodate the Clerk's date stamp.

**EXHIBIT A**

| 13 | 7/18/19 | | Defendant | * | Plaintiff PNR[16AZF0216 NEWPORT FRONTIER 000109] |
|---|---|---|---|---|---|
| 14 | 7/18/19 | | Defendant | * | Plaintiff employment records [SOLAR SHIELD 001-611] |
| 15 | 7/18/19 | | Defendant | * | Express Care of Ocala records and bills [EXO 001-085] |
| 16 | 7/18/19 | | Defendant | * | Munroe Regional Medical Center records and bills [MRMC 001-350] [MRMC BILL 001-004] |
| 17 | 7/18/19 | | Defendant | * | Central Florida Cancer and Blood Center records [CFCBC 001-066] |
| 18 | 7/18/19 | | Defendant | * | CVS Pharmacy records [CVS 001-004] |
| 19 | 7/18/19 | | Defendant | * | Aetna Insurance records [AETNA 001-063] |
| 20 | 7/18/19 | | Defendant | * as demonstrative Objection as exhibit | Timeline of events |
| 21 | 7/18/19 | | Defendant | * as demonstrative Objection as exhibit | Timeline of events 2 |
| 22 | 7/18/19 | | Defendant | * | 03.05.2019 medical exam video |
| 23 | 7/18/19 | | Plaintiff | * | Vanessa Newport deposition transcript |
| 24 | 7/18/19 | | Plaintiff | * | Danny Newport deposition transcript |
| 25 | 7/18/19 | | Plaintiff | * | Jennifer Newport Balitz deposition transcript |
| 26 | 7/18/19 | | Plaintiff | * | Frank McKinney deposition transcript |
| Group 27 | 7/18/19 | | Plaintiff | * | 7 Photographs of plaintiff's injuries taken 2/23/16, 2/29/16, and 3/10/2016  [produced 9/25/18] |
| Group 28 | 7/18/19 | | Plaintiff | * | 47 Photographs of plaintiff's injuries taken from February 15, 2016 through February 8, 2017 [produced 2/28/19] |
| | | | | | |
| | | | | | |

[1]Use a code (e.g. "A"or "*") in this column to identify exhibits to be received in evidence by agreement without objection. Otherwise, specifically state each objection to each opposed exhibit. Please note that each date box on the left must be one inch wide to accommodate the Clerk's date stamp.

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISOIN

VANESSA NEWPORT

   CASE NO:  6:18-CV-536-Orl-18GJK

  Plaintiffs,

vs.

FRONTIER AIRLINES, INC.,

  Defendant.

_____/

## PLAINTIFF'S AMENDED WITNESS LIST

  COMES NOW the Plaintiff, VANESSA NEWPORT, by and through their undersigned counsel and pursuant to the Amended Order Scheduling Cause for Pre Trial Conference and Jury Trial, dated June 11, 2018, hereby submit the following list of  witnesses anticipated to be called during the trial of this case:

1. Vanessa Newport, 625 South East 52 Ct., Ocala, Fl 34471;
2. Jennifer Balitz, 85 Pecan Course Circle, Ocala, FL 34472;
3. Danny Newport, 625 SE 52nd Court, Ocala, FL 34471;
4. Frank H. Mckinney, 1955 SW 87 Place, Ocala, FL 34476.

## CERTIFICATE OF SERVICE

  **I CERTIFY** that on this July 30th, 2019, I electronically filed the foregoing with the e-filing portal which will furnish a true and correct copy via e-mail to Tara Shelke from Adler Murphy and McQuillen, LLP, Attorney for Defendant, FRONTIER AIRLINES, INC.

     **/s/ Christina Figueroa**
     CHRISTINA FIGUEROA, ESQ.
     Florida Bar No.: 120248
     Hogan Law, P.A.
     5734 S. Semoran Blvd
     Orlando, FL 32822
     Tel: (407) 377-0700
     Fax: (407) 377-0701
     *Attorneys for Plaintiff*

**EXHIBIT B**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

VANESSA NEWPORT,

        *Plaintiff,*

v.                                                             Case No.: 6:18-cv-00536-Orl-18GJK

FRONTIER AIRLINES, INC.,

        *Defendant.*

_____/

## DEFENDANT FRONTIER AIRLINES, INC.'S WITNESS LIST

    Defendant FRONTIER AIRLINES, INC. ("Frontier"), by its undersigned attorneys, and in Compliance with the Case Management and Scheduling Order, hereby files this Witness List as follows:

1.    Plaintiff Vanessa R. Newport ("Plaintiff")
c/o HOGAN LAW
5734 S. Semoran Blvd
Orlando, FL 32822

2.    Danny K. Newport
625 SE 52nd Court
Ocala, Florida 34471

3.    Jennifer Newport Balitz
85 Pecan Course Circle
Ocala, Florida 34472

4.    Frank H. McKinney
Solar Shield Industries, Inc.
1955 SW 87th Place
Ocala, Florida 34476

**EXHIBIT C**

5.      Flight Attendant Dawn Weaver
        c/o ADLER MURPHY & McQUILLEN LLP
        20 South Clark St., Suite 2500
        Chicago, IL 60603

6.      Frontier Flight Attendant Melinda Butler
        c/o ADLER MURPHY & McQUILLEN LLP
        20 South Clark St., Suite 2500
        Chicago, IL 60603

7.      Frontier Flight Attendant Teri Quince-Rooney
        c/o ADLER MURPHY & McQUILLEN LLP
        20 South Clark St., Suite 2500
        Chicago, IL 60603

8.      Pilots for Frontier Flight 1220
        c/o ADLER MURPHY & McQUILLEN LLP
        20 South Clark St., Suite 2500
        Chicago, IL 60603

9.      Laura T. Rush
        Director of In-Flight Services
        c/o ADLER MURPHY & McQUILLEN LLP
        20 South Clark St., Suite 2500
        Chicago, IL 60603

10.     Bradley J. Lampert
        Vice President of Flight Operations
        c/o ADLER MURPHY & McQUILLEN LLP
        20 South Clark St., Suite 2500
        Chicago, IL 60603

11.     Frontier Representative
        c/o ADLER MURPHY & McQUILLEN LLP
        20 South Clark St., Suite 2500
        Chicago, IL 60603

12.     Passengers seated near Plaintiff
        Addresses unknown

13.     Dr. Ravi Koti
        Central Florida Cancer & Blood Center, P.A.
        2494 SW 19th Avenue Rd Ste 200
        Ocala, FL 34471

14.     Plaintiff's medical providers

*Page 2 of 3*

**EXHIBIT C**

CENTRAL FLORIDA CANCER AND BLOOD CENTER
Subjects: Plaintiff's health before and after the alleged incident, Plaintiff's alleged injuries and damages

15.      Dr. Joshua Carson, MD, FACS
c/o ADLER MURPHY & McQUILLEN LLP
20 South Clark St., Suite 2500
Chicago, IL 60603

16.      Any and all witnesses identified by plaintiff.


Defendant reserves the right to call and/or rely on the testimony of any or all of the parties above-named and any witnesses identified or obtained through future discovery or lists of witnesses of any other party to this action and rebuttal and/or impeachment witnesses as required.

*Page 3 of 3*

**EXHIBIT C**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

VANESSA NEWPORT,

       *Plaintiff,*

v.                                Case No.: 6:18-cv-00536-Orl-18GJK

FRONTIER AIRLINES, INC.,          The Honorable G. Kendall Sharp
                                    Magistrate Judge Karla R. Spaulding

       *Defendant*

_____ /

## DEFENDANT FRONTIER AIRLINES, INC.'S RULE 26(a)(2) EXPERT DISCLOSURE

       Defendant FRONTIER AIRLINES, INC. ("Frontier") by its undersigned counsel makes the following disclosure pursuant to Fed. R. Civ. P. 26(a)(2) of the witnesses it may use at trial to present evidence under Fed. R. Evid. 702, 703, or 705:

1.    ***Joshua Carson, MD, FACS***. Frontier attaches Dr. Carson's written report, *curriculum vitae*, and fee schedule to this disclosure. Dr. Carson has not testified as an expert at trial or by deposition in any case during the previous four years.

Date: March 15, 2019                     Respectfully submitted,

                                     **FRONTIER AIRLINES, INC.**

                                     By: */s/ Tara Shelke*_____
                                         One of Its Attorneys

Brian T. Maye (admitted *pro hac vice*)
Tara Shelke (admitted *pro hac vice*)
ADLER MURPHY & McQUILLEN LLP
20 South Clark Street, Suite 2500
Chicago, Illinois 60603
Phone: (312) 345-0700
Email: bmaye@amm-law.com
        tshelke@amm-law.com

- AND -

*Page 1 of 2*

**EXHIBIT D**

Dennis R. O'Connor (FBN: 376574)
O'CONNOR & O'CONNOR, LLC
800 North Magnolia Avenue, Suite 1350
Orlando, Florida 32803
Phone: (407) 843-2100
Email: doconnor@oconlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2019, the foregoing was served on the following party by email and U.S. mail.

Christina Figueroa
HOGAN LAW
5734 South Semoran Blvd.
Orlando, Florida 32822

## ATTORNEY FOR PLAINTIFF

By:   */s/ Tara Shelke*
One of the attorneys for Defendant
FRONTIER AIRLINES, INC.
ADLER MURPHY & McQUILLEN LLP
20 South Clark Street, Suite 2500
Chicago, Illinois 60603
Phone: (312) 345-0700
Email: bmaye@amm-law.com
           tshelke@amm-law.com

*Page 2 of 2*

**EXHIBIT D**

# Joshua Carson, MD, FACS

702 NE 11th Ave
Gainesville, FL 32601

March 10, 2019

Brian T. Maye
Tara Shelke
ADLER MURPHY & McQUILLEN LLP
20 South Clark Street, Suite 2500
Chicago, Illinois 60603

Re:     ***Vanessa Newport v. Frontier Airlines, Inc.***
        Case No.: 6:18-cv-00536-Orl-18GJK

Mr. Maye:

I had the opportunity to perform an independent medical evaluation on Vanessa Newport on Tuesday, March 5, 2019 in Orlando, Florida. Ms. Newport came to the evaluation at the appointed time, accompanied by her husband. Also present for this encounter was a videographer, provided by Ms. Newport's counsel. For this in-person component of the evaluation, I asked Ms. Newport a series of questions pertaining to her injury, symptoms, treatment, and pertinent medical history. In addition to this in-person assessment, I reviewed the following records:

1.    Plaintiff's Complaint

2.    November 13, 2018 deposition of Vanessa Newport

3.    Medical records for patient Vanessa Newport provided by defense counsel, including:

        a.    Records from Munroe Regional Medical Center;
        b.    Records from Express Care of Ocala;
        c.    Records from Central Florida Cancer and Blood Center

4.    Photographs of injury taken by Vanessa Newport provided by defense counsel.

*Page 1 of 8*

**EXHIBIT D**

**HISTORY (AS COMPILED FROM PATIENT INTERVIEW AND REVIEW OF RECORDS):**

Burn Injury

Ms. Newport reports that she incurred burn injuries on February 14, 2016 onboard a flight from Las Vegas to Orlando when a cup of hot water (for tea) spilled onto her lap mid-flight. Of note, she recalls that the pants she was wearing at the time were made from a cotton-synthetic blend fabric, and her underpants (in the area where she later identified her burns) were made from cotton. She reports that she felt intense pain from the hot water in her lap and on her seat. She reports that a flight-attendant tried to help her out by blotting up the water with paper towels. She states that she asked the flight attendant to hold off so that she could get out of her seat. She did not go to the lavatory to change clothes. The flight-attendant finished mopping up the excess water in the seat. Ms. Newport stood in the aisle for a bit, and then sat back down and remained seated for the rest of the flight. While she reports that there was intense pain on contact from the hot water, she reports that she did not notice much pain for the rest of the flight.

Upon landing and deplaning, several hours after the spill, Ms. Newport went to change her clothes in a restroom in the airport. This was when she was first able to see her burn sites (in part), and she reports noticing redness on her thighs. She reports that the injuries were still not particularly painful at this time. She was picked up by her husband at the airport, and elected to go to a restaurant for dinner at this time. When she got home later that evening, she noticed some blistering on her thighs upon changing. She looked on the internet for information on burn management, and began placing gauze and bandages over the affected areas to keep them clean and (possibly) applying some over-the-counter topical treatment. She did not seek professional medical attention.

Ms. Newport notes that her burns did not cause her significant pain in the week following injury. (She notes that she understands this absence of pain was caused by nerve damage from the burns.) Ms. Newport reports that she went to her primary care physician (Frank Reisner, MD) ten days following her burn injury (on 2/24/2016) to evaluate her burn out of concern that the injuries were not healing as she expected. (Of note, the physician's documentation reports that her primary reason for this visit was to address an ongoing cough.) Dr. Reisner identified healing second degree burns at upper thighs and buttocks and first degree burns on left thigh. For treatment of these burns, he prescribed Silvadene cream and Tylenol with Codeine.

Ms. Newport followed up with Dr. Reisner about one week later. He described her burns as "healing well" along the thigh and "healing slowly" at the buttocks. At this point, Dr. Reisner referred her for hydrotherapy for further treatment of her wounds. Records from her initial evaluation at Munroe Medical Center Hydrotherapy on 03/04/2016 document three wounds measuring 2cm x 1cm, 2cm x 1cm, and 4cm x 1.5cm. Her pain at the wound sites is rated as "4/10 or less." In the notes documenting the hydrotherapy treatments, the wound therapist answers "No" to the prompt/question "Pain is present and interferes with treatment." Her course of hydrotherapy treatments was abandoned after a

**EXHIBIT D**

few treatments when she was admitted to hospital for inpatient management of a DVT (discussed below).

On my interview, Ms. Newport reports that her burns have been causing her marked pain and discomfort since 2016. She states that it makes it painful for her to sit in place, such that she cannot sit in place for extended periods of time without needing to shift positions or get up from sitting repeatedly. She describes paresthesias (painful "tingling") at the wound sites as well as hypersensitivity. She also complains of unsightly scaring from the injuries.

On review of Ms. Newport's medical records, I see very little mention of these symptoms after March 2016. She presented to her primary care clinic multiple times for a variety of aches, pains, and maladies. Over the course of over two years (from 04/2016 through 04/2018), her primary care clinic documented complaints of dysuria, cough, back pain, bone pain, and shoulder pain. However, only once (on 02/18/2017) during this time period do I see mention of a complaint of pain or discomfort at her burn sites - the practitioner notes as a secondary complaint that "She also complains of paresthesias in legs where she previously had burns." Of particular interest, symptoms from her burns do not show up in any of the "Review of Symptoms" sections of her medical notes over this period. ("Review of Systems" refers to a process by which the physician checks for any symptoms the patient has not thought to mention on their own by asking a series of questions that screen for symptoms in a wide range of areas.)

DVT

On March 16, 2016, Ms. Newport developed non-specific symptoms of feeling "not well" and chest-pains, prompting her to present to Dr. Reisner for evaluation. Dr. Reisner identified an elevated D-Dimer on bloodwork, prompting him to refer Ms. Newport for a series of tests, including an ultrasound of the lower extremity which identified a deep venous thrombosis (DVT) in the proximal left femoral vein. The rest of the vein and system was patent. V/Q scan showed no indication of pulmonary embolism. She was admitted to Munroe Regional Medical Center for management of her DVT. While Ms. Newport repeatedly states that she was placed on "bed-rest" on admission, I do not see any such orders in the records I reviewed, nor do I see any medical reason why such limitation would be prescribed for a simple DVT. She was discharged home upon conversion from intravenous to oral medication for treatment of her DVT.

During this admission, a hematology consult was provided by Dr. Ravi Koti. After reviewing the patient's history and evaluating, he noted his initial impression that this embolism "appears to be spontaneous." A battery of tests were ordered on Dr. Koti's recommendation in search of any potential underlying risk-factors or coagulation disorders that may have contributed to Ms. Newport's DVT formation.

As an outpatient, Ms. Newport was treated with a six-month course of oral anticoagulation to encourage resolution and prevent recurrence of her DVT. She returned to the emergency room on 03/22/2016 with concern for a possible recurrent or

progressive DVT due to symptoms of shortness of breath and leg tingling. Ultrasound at this time showed complete resolution of the previously diagnosed left femoral DVT. In November 2016, a final ultrasound of the lower extremity confirmed persistent resolution of the DVT.

On outpatient follow up, Dr. Koti (hematology) noted that Ms. Newport's coagulopathy identified abnormally low levels of Antithrombin III (ATIII). As an ATIII deficiency would cause hypercoagulability (a condition where the blood clots more than it should), Dr. Koti recommended further testing to confirm and better characterize Ms. Newport's disorder. According to his notes, Ms. Newport repeatedly refused this recommended testing despite Dr. Koti's repeated recommendation.

**PHYSICAL EXAMINATION:**

On physical exam, Ms. Newport is a pleasant and cooperative adult female appearing her stated age. She is well groomed and in no acute distress. Her thought processes are linear, and she does not demonstrate any frank signs of confusion, cognitive delay, or delirium.

During the entirety of our interview I did not note that Ms. Newport showed any difficulty sitting still or maintaining a seated position. She did not seem to need to stand up at any point in time for comfort reasons. I did not notice any tendency to shift her weight from side to side with any frequency that would indicate difficulty maintaining a comfortable sitting position.

Scar Exam

In terms of her scars, I had the opportunity to inspect her scars close up. On her left thigh she had a very faint area of hypopigmentation that was only really evident on up-close inspection. There was no evidence of hypertrophic scar, keloid or scar contracture, and there were not areas of open skin or breakdown.

I could not appreciate any visible scars on her inner thighs.

Examination of her posterior identified symmetric areas of faint hyperpigmentation on the inferior-medial aspect of each buttock. These were approximately 1cm x 2cm each. There is no hypertrophic scar, scar contracture, open area, or contour defect.

Left lower extremity exam (re DVT history)

Her lower extremities were symmetric. There was no evidence of unilateral swelling on the left. There were no prominent varicosities, nor did she exhibit signs of chronic-venous-stasis changes beyond normal age-related changes.

**ASSESSMENT AND CONCLUSIONS:**

Mechanism of Injury

The mechanism reported by Ms. Newport of spilling hot water onto her lap is certainly capable of creating a burn injury. Pertinent factors present include the clothing she wore, the fluid involved (water), and her immediate care of the area.

That the liquid that burned her was water is to her advantage as it evaporates rapidly and easily. Unlike hot oils or creams, water does not stick to the skin and does not continue to burn for long periods of time. As water evaporates, it rapidly cools.

Her injury was also mitigated by the fabrics she was wearing. She described the pants she was wearing as breathable polyester fabric. There is no report of this fabric melting and adhering to her skin. In the area of the buttock burns, the skin was covered with a breathable cotton layer. These fabrics would have allowed for the process of evaporation to proceed, with resultant cooling.

It is notable that Ms. Newport did not take any measures to cool off these injuries initially. It is generally recommended that one cools small burns (such as these) to temperatures at or slightly below room body temperature as soon as possible. This can easily be accomplished by a brief rinse in tepid-to-cool water or, at least, by simply removing any heated clothing and allowing to cool by air-convection. Ms. Newport's failure to do so may have resulted in the injury being larger and deeper than it would have been had she cared for it appropriately. Having said that, the utility of such cooling measures is limited to the brief period of time immediately following the injury. After several minutes, the water would have cooled to temperatures well below burning. After a few minutes had passed, she did not further the severity of the burns by remaining in her seat for the duration of the flight.

Description of Injury

I would characterize the injuries Ms. Newport incurred on February 14, 2016 as first and second-degree burns using classic terminology. Using the more recent nomenclature, I would describe these injuries as principally superficial-partial-thickness burns with small areas of deep-partial-thickness injury. I based this description on the reported mechanism of injury, her medical records, the pictures provided, and my physical exam of the areas in their current state. The photo documentation of the wounds provided in conjunction with the current status of her wounds make it clear that she did not have any full thickness a.k.a. third-degree burns.

The one aspect of the case as presented that is inconsistent with this assessment (i.e., not consistent with the rest of the data provided) is the patient's report of the time-course of her pain symptoms. She describes the wounds as excruciatingly painful on immediate injury, then essentially painless from the time she landed in Orlando until her encounter with Dr. Reisner over one week later. She then describes the development of

*Page 5 of 8*

**EXHIBIT D**

marked pain later in the course of recovery that she reports as persistent to the present day. This is not consistent with the small, partial-thickness injuries she sustained. For the injuries to have been painless within the first 48 hours of injury, they would have needed to be full-thickness burns, destroying the entirety of the sensory-innervated layer skin involved. Such injuries can result in a lack of pain (or any sensation) initially, followed by progressive neuropathic pain as the nerve-endings regenerate and repair over the ensuing months. The pictures provided show pink, living tissue at the surface of these wounds, which indicates intact nerve endings. Furthermore, injuries of sufficient depth to cause such a symptom pattern would be too deep to heal as cleanly as her injuries have healed. Full-thickness burns can only heal by gradual pulling together of the edges to close the gap in between. One would expect that such a process would result in permanent scar contractors that would be evident on physical exam to this day. I see no such scarring patterns at the site of any of the injuries described.

Management and Treatment of Wounds

While Ms. Newport's failure to seek medical attention shortly after the injury certainly did not help of the course of her burn wounds, it is hard to say whether or not it had a negative impact on her recovery. It is certainly advisable to consult with a physician within a few days of an injury. Having said that, the biggest benefit to seeking early medical attention for superficial burns, such as those incurred by Ms. Newport, is derived from interventions aimed at preventing infection, and I do not see any evidence suggesting a wound infection in these injuries. Short of preventing infection and minimizing pain through high-quality dressings and medical analgesia, early medical care for superficial burns such as these is not essential to heal such wounds.

A Note on the Patient's Hydrotherapy Treatment

Ms. Newport states that her hydrotherapy treatment was aborted because she had to be admitted to the hospital. Although the hydrotherapy may have been somewhat helpful in expediting healing, but it is by no means essential for treatment of such wounds. Given the documented description of her wounds and the pictures she provided, were Ms. Newport to have presented to my care for such wounds, I would not have treated with hydrotherapy. Ms. Newport's statement that her hydrotherapy had to be aborted due to her need for a hospital admission for DVT management is misleading. On admission to hospital, if her physicians deemed hydrotherapy to be an essential component of her care, they would have been obligated to transfer her care to a hospital with an inpatient burn center. They could have easily transferred her to the regional burn center at a hospital located within an hour of the hospital where she was admitted, where a complete range of therapies would have been available to utilize in treatment simultaneous with her treatment for the DVT. The fact that she did not receive hydrotherapy after hospital admission for her DVT is an indication that the hospital determined that such therapy was not necessary.

Prognosis and Anticipated Sequelae

As to the prognosis of these injuries in the context of proper medical treatment, there is a period of pain for days to weeks followed by a complete healing with variable degrees of scarring depending upon the patient's skin factors and depth of the injury. In Ms. Newport's case, the sequelae appear to be minimal. Examination of her scars indicates complete healing with very minimal scarring.

Given the status of the wounds on my examination on March 5, 2019, I think the long-term impact of these injuries is negligible.

It should be noted that there is no role for surgical treatment of these wounds at this point in time, nor do I anticipate the need for any such treatment in the future. I know the patient mentions that she has been given reason to believe that she may require surgery in the future related to a potential skin graft. I see absolutely no indication for skin grafting of these wounds as they are already healed and the scarring expecting the skin graft would likely be significantly more morbid and problematic than the minimal scarring she has now.

DVT

On March 17, 2016, Ms. Newport was diagnosed with a deep venous thrombosis located in the proximal portion of her left femoral vein. It is my opinion that this diagnosis most likely represents an incidental finding. The development of the DVT was not at all related to her burn injury.

I describe this diagnosis as an incidental finding, because it does not account for any of the symptoms prompting its discovery. The ultrasound that identified Ms. Newport's DVT was prompted by a complaint of chest pain for one day. The motivation for obtaining such an ultrasound was to rule out a possible pulmonary embolism. After identifying the clot in her vein, her physicians obtained a V/Q scan to search for more direct evidence of a pulmonary embolism. The scan was negative.

As to the connection between the clot and her burn, there is no connection. It should be noted that, anatomically, the clot is completely separate from the areas of burn. The patient's burn is in the superficial aspect of her skin. A deep venous thromboembolism is by definition located in the deep venous system. This lays many layers below the skin, underneath the skin, fat, and soft tissue below the burn. Furthermore, Ms. Newport's DVT was located in the proximal femoral vein, an area that is far higher up in the thigh than the area where she was burned.

As to the suggestion that Ms. Newport's decreased mobility as a result of the burns somehow led to the formation of the DVT, I find this highly implausible. Patients with severe tremors are at risk for thromboembolism. This is generally attributed to their prolonged immobility, needing to stay in bed recumbent, and not moving at all for days on end. Here, Ms. Newport reports that the burns were not particularly painful immediately

*Page 7 of 8*

**EXHIBIT D**

after injury. As to the discomfort she experienced later, causing her to have difficulty sitting, these symptoms would not be expected to increase her risk for thromboembolism. Ms. Newport describes being bothered by difficulties with sitting for prolonged periods, requiring her to frequently stand up and/or shift positions for comfort. This is exactly the kind of mobility that we typically recommend for patients to avoid thromboembolism. So Ms. Newport's description of actively moving, and her statements that she continued to go to work after the incident, is clear evidence that she was not immobile, and her risk for thromboembolism did not increase due to any immobility.

Ms. Newport's blood work identified a relative deficiency in Antithrombin III (ATIII). ATIII helps the blood prevent or dissolve clots. An ATIII deficiency, therefore, makes a patient's blood more prone to forming clots. This deficiency, rather than the burn, likely contributed to the development of her DVT.

Joshua Carson, MD, FACS

**Additional references utilized in forming this opinion:**

1.  American Burn Association. Advanced Burn Life Support Provider Manual. 2016. American Burn Association, Chicago, IL.

2.  Mlcak RP, Buffalo MC, Jimenez CJ. Prehospital Management, Transportation, and Emergency Care. In: Herndon DN, ed. *Total Burn Care*, 5th ed. 2018. Elsevier.

3.  Voigt CD, Celis M, Voigt DW. Care of Outpatient Burns. In: Herndon DN, ed. *Total Burn Care*, 5th ed. 2018. Elsevier.

4.  Jandera V, Hudson DA, de Wet PM, Innes PM, Rode H. Cooling the burn wound: evaluation of different modalities. *Burns*, 2000. 26 (3):265-270.

5.  Tredget EE, Levi B, Donelan MB. Biology and Principles of scar management and burn reconstruction. *Surg Clin North Am*, 2014. 94(4):793-815.

6.  Shupp JW, Nasabzadeh TJ, Rosenthal DS, et al. A review of the local pathophysiologic bases of wound progression. *J Burn Care Res*, 2010. 31(6):849-873.

7.  Brownson EG, Gibran NS. Evaluation of the Burn Wound: Management Decisions. In: Herndon DN, ed. *Total Burn Care*, 5th ed. 2018. Elsevier.

8.  Hawkins HK, Jayson J, Finnerty CC. Pathophysiology of the Burn Scar. In: Herndon DN, ed. *Total Burn Care*, 5th Edition. 2018. Elsevier.

**EXHIBIT D**

# CURRICULUM VITAE

## Joshua Carson, MD, FACS

### ACADEMIC AND CLINICAL APPOINTMENTS

2016-current — **University of Florida Department of Surgery**
Assistant Professor

2016-current — **Shands Hospital, UF Health System**
Attending Surgeon
Burns, Trauma, Emergency Surgery and Surgical Critical Care

2016-current — **Shands Burn Center, UF Health System**
Associate Director

### PROFESSIONAL TRAINING

2014-2016 — **Shriners Hospital for Children – Galveston, and University of Texas, Medical Branch**
Galveston, Texas
Fellow in Acute and Reconstructive Burn Surgery, Surgical Critical Care

2011-2014 — **University of California Los Angeles Health System**
Los Angeles, California
Resident in General Surgery

2009-2011 — **Memorial Sloan Kettering Cancer Center**
New York, NY
Fellow in Surgical Research

2007-2009 — **New York Presbyterian Hospital, Cornell Medical Center**
New York, NY
Resident in General Surgery

### UNDERGRADUATE & GRADUATE EDUCATION

2002-2007 — **Weil College of Medicine, Cornell University**
New York, New York
Medical Doctor

1998-2002 — **Harvard College, Harvard University**
Cambridge, Massachusetts
Bachelor of Arts Cum Laude, English & American Literature & Language

### STATE MEDICAL LICENSES

New York (255914)                Issued: 2009-2011 (not renewed)
California (A116793)             Issued: 2011
Florida (ME 128369)             Issued: 2015

**EXHIBIT D**

**BOARD CERTIFICATION**
General Surgery (060335)                                  Issued: 2015
Surgical Critical Care (003812)                          Issued: 2016


**NATIONAL COMMITTEE MEMBERSHIPS**

| | |
|---|---|
| 2019-present | Eastern Association for the Surgery of Board of Directors (Member) |
| 2019-present | Eastern Association for the Surgery of Trauma Burn Surgery Task Force (Chair) |
| 2018-present | American Burn Association ad Hoc Committee on Junior Faculty Development Fellowship (Member) |
| 2017-present | American Burn Association Committee on the Organization and Delivery of Burn Care (Member) |
| 2017-present | Life Impact Burn Recovery Evaluation Advisory Board (Member) |


**INSTITUTIONAL COMMITTEES**

| | |
|---|---|
| 2018-present | University of Florida, Shands Hospital Pharmacy and Therapeutics Committee |
| 2016-present | University of Florida, Shands Hospital Transfusion Committee |
| 2018-present | University of Florida, Shands Hospital Blood Utilization Committee |
| 2016-present | University of Florida, Shands Hospital Trauma Quality Committee |


**EDITORIAL DUTIES**

| | |
|---|---|
| 2018 – present | Digital Media Editor, Journal of Burn Care and Research |
| 2018 – present | Producer and Host: "The JBCR Podcast" |
| 2017 – present | Member, Journal of Burn Care and Research Editorial Advisory Board |

*Ad Hoc* Peer Reviewer
   Journal of Burn Care and Research
   Burns
   American Board of Surgery Scientific Forum
   Experimental Gerontology

**EXHIBIT D**

**PANEL MODERATOR**
>    Southern Regional Burn Meeting. November, 2018. Mobile Alabama. Poster session
>    moderator, oral presentation judge.
>    American College of Surgery, Trauma session moderator. October, 2018. Boston,
>    Massachusetts.
>    American Burn Association National Meeting, April, 2018. Chicago, Illinois. November,
>    2017. Poster session moderator.
>    Southern Regional Burn Meeting. October, 2017. Miami, Florida. Poster session
>    moderator.
>    American Burn Association National Meeting, April, 2017. Boston, Massachusetts.
>    Poster session moderator.

**PROFESSIONAL SOCIETY MEMBERSHIPS:**

>    American Burn Association
>    American College of Surgeons
>    American Medical Association
>    Eastern Association for the Surgery of Trauma
>    International Society for Burn Injuries
>    The Longmire Surgical Society
>    Florida Committee on Trauma

**ACTIVE RESEARCH STUDIES:**

1.   Incidence of Burn Injuries in the Wake of Major Weather Events
     Primary Investigator
     August 2018 – Ongoing
     Physician Initiated- UF Department of Surgery

2.   Dissecting the Roles of Muscle and Fat in the Catabolic Response to Massive
     Thermal Injury: A Longitudinal Observational Study
     Primary Investigator
     November 2018 - Ongoing
     Physician Initiated- UF Department of Surgery

3.   Evaluating a Point-of-Care, Quantitative Matrix Metalloproteinase Assay as a
     Predictor of Successful Graft Take in Patients Undergoing Cutaneous
     Autografting for Acute Burn Injury
     Primary Investigator
     April 2017 - Ongoing
     Physician Initiated- Department of Surgery and the UF Wound Healing
     Institute sponsored

4.   Evaluating a Multi-Marker Urine Assay ("NephroCheck") and Associated
     Clinical Algorithm as a Risk Measure for Renal Failure in Patients
     Undergoing Treatment for Large Burns
     Primary Investigator
     May 2017 - Ongoing
     Physician Initiated- Department of Surgery sponsored

**EXHIBIT D**

5. Identifying Factors that Influence Burn Patients Perception of Current Patterns and Pain Control
Primary Investigator
February 2018 – Ongoing
Physician Initiated- UF Department of Surgery

6. A Randomized, Double-Blind, Placebo-Controlled Study of the Efficacy, Safety, and Tolerability of Serlopitant for the Treatment of Pruritus Following Burn Injury
Sub-Investigator
Primary Investigator David W. Mozingo, MD
March 2017- Ongoing
Industry sponsored

7. A Randomized Trial of Enteral Glutamine to Minimize Thermal Injury
Sub-Investigator
Primary Investigator David W. Mozingo, MD
May 2016 - Ongoing
Federally Funded- NOA to date $2,290.00

8. A Multicenter, Multinational, Randomized, Controlled, Assessor Blinded Study, Performed in Subjects with Thermal Burns, to Evaluate the Efficacy and Safety of NexoBrid Compared to Gel Vehicle and Compared to Standard of Care
Sub-Investigator
Primary Investigator David W. Mozingo, MD
July 2016- Ongoing
Industry sponsored-NOA to date: $10,140.50

9. Epicel (cultured Epidermal Autografts) Humanitarian Device Project
Primary Investigator Joshua S Carson, MD
Assumed PI Responsibilities March,  2017
April 2010 - Ongoing
Humanitarian Device Project-Unfunded

10. A Retrospective Single Center Characterizing the Incidence of Herpes Simplex Virus Infection As Well As Outcomes in Patients Post Herpes Simplex Viral Infection
Sub-Investigator, starting 2016
Primary Investigator David W. Mozingo, MD
June 2010-Present
Physician Initiated –Department of Surgery sponsored

11. Protective Effects of Propranolol in Adults Following Major Burn Injury: A Safety and Efficacy Trial
Sub-Investigator, starting 2016
Primary Investigator David W. Mozingo, MD
January 2014-Present
Federally Funded-NOA to date $26,680.49

12. Retrospective: Review of Sepsis Management System in a Burn Center
Sub-Investigator, starting 2016
Primary Investigator David W. Mozingo, MD

March 2014-Present
Physician Initiated- Department of Surgery sponsored

13. Lidocaine in the Treatment of Post-Operative Pain Management from a Donor Site
After Split-Thickness Skin Graft Harvesting Following Thermal Injury
Sub-Investigator, starting Jan 20016
Primary Investigator Jennifer Mallek, MD and James Gallagher, MD
December 2013- Ongoing
Physician Initiated- Departments of Surgery and Anesthesiology sponsored

## PUBLICATIONS:

1. Cambioo-Daniel J, Rivas E, Carson JS, Hundershagen G, Lopez ON, Glover SQ, Herndon DN, Suman OE. Cardiorespiratory capacity and strength remain attenuated in children with severe burn injuries at over 3 years postburn. The Journal of Pediatrics 2018; 192:152-158.

2. Carson JS, Khozrozadeh H, Norbury W, Herndon DN. Nutritional Support of the Burn Patient. In Total Burn Care, 5th edition, ed David Herndon. Elsevier, 2017.

3. Carson JS, Goverman J, Fagan S. Acute Kidney Injury in Association with Thermal Injury. In Total Burn Care, 5th edition, ed David Herndon. Elsevier, 2017.

4. Fagan SP, Carson J, Jimenez C, Chai J, Spies M, Holyoak M, Muller MJ, Goodwin CW, Herndon DN. Exfoliating Diseases of the Integument and Necrotizing Soft Tissue Infection. In Total Burn Care, 5th edition, ed David Herndon. Elsevier, 2017.

5. Ady J, Thayantihy V, Mojica K, Wong P, Carson J, Rao P, Fong Y, Lou E. Tunneling nanotubes: an alternate route for propagation of the bystander effect following oncolytic viral infection. Mol Ther Oncolytics 2016; 3:16029.

6. Warner S, Haddad D, Au J, Carson J, O'Leary M, Lewis C, Monette S, Fong Y. Oncolytic Herpes Simplex Virus Kills Stem-like Tumor Initiating Colon Cancer Cells. Mol Ther Oncolytics 2016; 3:16013.

7. Carson J, Al-Mousawi A, Finnerty C, Herndon DN. Metabolism and Surgical Nutrition. In Sabiston's Textbook of Surgery: The Biological Basis of Modern Surgical Treatment, 20th edition, ed Townsend CM, and RD Beauchamp, BM Evers, and KL Mattox. Elsevier, 2016 (Philadelphia).

8. Gholami S, Chen CH, Gao S, Lou E, Fujisawa S, Carson J, Nnoli JE, Chou TC, Bromberg J, Fong Y. Role of MAPK in oncolytic herpes viral therapy in triple-negative breast cancer. Cancer Gene Ther 2014; 21(7): 283-9.

9. Jun KH, Gholami S, Song TJ, Au J, Haddad D, Carson J, Chen C, Mojica H, Zanzonico K, Chen P, Zhang NG, Szalay Q, Fong Y. A novel oncolytic viral therapy and imaging technique for gastric cancer using a genetically engineered vaccinia virus carrying the human sodium iodide symporter. J Exp Clin Cancer Res 2014; 33:2.

10. Au JT, Mittra A, Song TJ, Cavnar M, Jun K, Carson J, Gholami S, Haddad D, Gaujoux S, Monette S, Ezell P, Wolchok J, Fong Y. Irreversible electroporation facilitates gene transfer of a GM-CSF plasmid with a local and systemic response. Surgery 2013; 154(3):496-503.

11. Haddad D, Chen CH, Carlin S, Silberhumer G, Chen NG, Zhang Q, Longo V, Carpenter SG, Mittra A, Carson, Au J, Gonen M, Zanzonico PB, Szalay AA, Fong Y. Imaging characteristics, tissue distribution, and spread of a novel oncolytic vaccinia virus carrying the human sodium iodide symporter. PLoS One 2012; 7(8):e41647.

12. Au JT, Carson J, Monette S, Finley DJ. Spray cryotherapy is effective for bronchoscopic, endoscopic, and open ablation of thoracic tissues. Interact Cardiovasc Thorac Surg 2012; 15(4):580-4.

13. Au JT, Mittra A, Wong J, Carpenter S, Carson J, Haddad D, Monette S, Ezell P, Patel S, Fong Y. Flexible CO2 laser and submocosal gel injection for safe endoluminal resection in the intestines. Surg Endosc 2012; 26(1): 47-52.

14. Au JT, Wong J, Mittra A, Capenter S, Haddad D, Carson J, Jayaraman S, Monette S, Solomon SB, Ezell P, Fong Y. Irreversible electroporation is a surgical ablation technique that enhances gene transfer. Surgery 2011; 150(3):474-9.

15. Haddad D, Chen NG, Zhang Q, Chen CH, Yu YA, Gonzalez L, Carpenter SG, Carson J, Au J, Mittra A, Gonen M, Zanzonico PB, Fong Y, Szalay AA. Insertion of the human sodium iodide symporter to facilitate deep tissue imaging does not alter oncolytic or replication capability of a novel vaccinia virus. J Transl Med 2011; 31(9):36.

16. Carson J, Finley DJ. Lung cancer staging: an overview of the new staging system, and implications for radiographic clinical staging. Seminars in Radiology 2011; 46(3): 187-93.

17. Carpenter SG, Carson J, Fong Y. Regional liver therapy using oncolytic virus to target hepatic colorectal metastases. Semin Oncol 2010; 37(2): 160-9.

18. Carson J, Haddad D, Bressman M, Fong, Y. Oncolytic herpes simplex virus 1 (HSV-1) vectors: increasing treatment efficacy and range through strategic virus design. Drugs of the Future 2010; 35(3): 183-195.

19. Haddad D, Chen NG, Zhang Q, Chen CH, Yu YA, Gonzalez L, Carpenter SG, Carson J, Au J, Mittra A, Gonen M, Zanzonico PB, Fong Y, Szalay AA. Insertion of the human sodium iodide symporter to facilitate deep tissue imaging does not alter oncolytic or replication capability of a novel vaccinia virus. J Transl Med 2011; 9:36.

20. Gardner J, van der Meulen M, Carson J, Zelken J, Ricciardi B, Wright T, Lane J, Bostrom M. The role of parathyroid hormone in the mechanosensitivity of fracture healing. J Orthop Res 2007; 25(11): 1474-80.

21. Carson J, Bostrom MPG. Synthetic bone scaffolds and fracture repair. Injury 2007; 38(Sup1): S33-7.

22. Carson J, Bostrom MPG. HIV associated osteoporosis. Curr Opin Orthop 2006 Oct; 17(5): 456-461.

23. Cellini C, Huston TL, Martins D, Christos P, Carson J, Kemper S, Simmons RM. Multiple re-excisions versus mastectomy in patients with persistent residual disease following breast conservation surgery. Am J Surg 2005 Jun; 189(6): 662-6.

24. Trocciola SM, Hoda S, Osborne MP, Christos PJ, Levin H, Martins D, Carson J, Daly J, Simmons RM. Do bone marrow micrometastases correlate with sentinel lymph node metastases in breast cancer patients? J Am Coll Surg 2005 May; 200(5): 720-5.

25. Cellini C, Hollenbeck ST, Christos P, Martins D, Carson J, Kemper S, Lavigne E, Chan E, Simmons R. Factors associated with residual breast cancer after re-excision for close or positive margins. Ann Surg Oncol. 2004 Oct; 11(10): 915-20.

**PRESENTATIONS:**

1. Elder C, Thigpin T, Karlnoski R, Smith D, Mozingo D, Carson JS. A multicenter feasibility study of an automated bedside glucose monitoring system in the burn intensive care setting. Oral presentation at the Southern Region Burn Conference. Miami, Nov 3, 2017.

2. Alava AN, Thigpin T, Popp J, Roberson L, Allen A, Mozingo DW, Carson JS. Patient factors and outpatient pain control in patients discharge from a regional burn center with minor-to-medium-sized burns. Oral presentation at the Southern Region Burn Conference. Miami, Nov 5, 2017.

3. Capek, KD; Trocme, S; Marsh, DS; Stout SC; Merkley, KH; Andersen, CR; Huang, TT; Voigt, CD; Carson JS; Herndon, DN. Total Ocular Surface Coverage with Amniotic-Membrane Transplantation in Acute Toxic Epidermal Necrolysis: A retrospective Comparison with Topical Treatment. Poster presented at SJS/TEN 2017: Building Multidisciplinary Networks to Drive Science & Translation; 2017 Mar 2; Orlando, FL.

4. Capek, KD; Voigt, CD; Carson, JS; Nunez-Lopez, OA; Crites, N; Reeves, PT; Trocme, SD; Finnerty, CC; Herndon, DN; Lee, JO. A 30-Year Burn Unit Experience with Adult and Pediatric Toxic Epidermal Necrolysis. Poster presented at SJS/TEN 2017: Building Multidisciplinary Networks to Drive Science & Translation; 2017 Mar 2; Orlando, FL.

5. Carson J, Herndon D, Huang T. Treatment of Open or Ulcerated Burn Scars on the Extensor Surfaces of the Elbows and Knees. Poster presentation at the American Burn Association 48th Annual Meeting. Las Vegas, May 4, 2016.

6. Carson J, Huang T. Encopresis in Pediatric Patients with Perineal and Perianal Burn Contracture. Presented at Southern Region Burn Conference. Dallas, November 22, 2015.

7. Carson J, Crites N, Grogans RA, Capek KD, Finnerty C, Lee JO, Herndon DN. Toxic epidermal necrolysis: A 30 Year institutional experience. Poster presentation at the American Burn Association 47th Annual Meeting. Chicago, April 23, 2015.

8. Carson J, Jeschke MG, Mlcak R, Herndon DN, Suman O. Structural and functional changes in pediatric burn victims two years after injury. Oral presentation at the American Burn Association 47th Annual Meeting. Chicago, April 23, 2015.

9. Carson J, Haddad J, Gholami S, Chen N, Zhang Q, Seung TJ, Jun K, Au J, Szalay AA, Rusch VW, Fong Y. hNIS Expressing Oncolytic Virus GLV-1h153 is a Promising Agent for the Imaging and Treatment of Non-Small Cell Lung Cancer. Presented at the 37th Annual Meeting of the Western Thoracic Surgery Association; June 2011.

10. Carson J, Carpenter SG, Marano D, Rusch VW, Fong Y. Lung cancer tumor-initiating cells overexpress GADD34 and are sensitive to viral oncolysis. Presented at the American Association for Thoracic Surgery 91st annual meeting; April, 2011.

11. Yang, X, Carson J,. van der Meulen M, Gollwitzer H, Osusky K, Lynch M, Hernandez-Soria A, Ricciardi B, Bostrom M. Blockade of beta-adrenergic signaling does not influence fracture healing in a mouse model. Presented at the 54th Annual Meeting of the Orthopaedic Research Society March 2008, San Francisco; Short Talk and Poster.

12. Gardner MJ, Carson J, Ricciardi B, Zelken J, Lane JM, van der Meulen MCH, Bostrom MP. The role of parathyroid hormone in the mechanosensitivity of fracture healing. 53rd Annual Meeting of the Orthopaedic Research Society 2007 Feb, San Diego; Short Talk and Poster #360.


**LECTURES:**

The University of Florida Department of Surgery Grand Rounds. "From the Ashes: Pediatric burn care from injury to adulthood." Gainesville, FL. May 7, 2017.

University of Florida Multidisciplinary Critical Care Grand Rounds. "Extremity Compartment Syndrome." Gainesville, FL. Jan 12, 2017.

University of Florida Multidisciplinary Critical Care Grand Rounds. "Burn Critical Care."
Gainesville, FL. Oct 27, 2016.

INFORMATION CONTAINED HEREIN REGARDING THE EXPERT WAS PROVIDED BY THE EXPERT
TO FORENSISGROUP, INC.  FORENSISGROUP, INC. DOES NOT ASSUME RESPONSIBILITY FOR
THE ACCURACY OF THE INFORMATION PROVIDED BY THE EXPERT ON HIS RESUME OR FOR ANY
CHANGES IN THE EXPERT INFORMATION THAT MAY OCCUR AFTER RECEIPT OF THIS RESUME.
IT IS THE CLIENT'S RESPONSIBILITY TO QUALIFY THE EXPERT AND TO VERIFY THE ACCURACY
OF ALL INFORMATION CONTAINED HEREIN.

# ForensisGroup®

301 North Lake Avenue, Suite 420, Pasadena, CA 91101-5119
626/795-5000 TEL  626/795-1950 FAX  800/555-5422 (Toll Free)
www.ForensisGroup.com

## Expert: Dr. Joshua Carson, M.D., F.A.C.S.
## ForensisGroup, Inc.'s Fee Schedule and Contract Conditions

| | |
|---|---|
| Records and Document Review | $550.00 per hour (minimum of 1 hour) |
| Narrative Report | $275.00 Flat Fee for first page |
| | $170.00 Flat Fee per each additional page |
| Conference with Attorney or Representative (phone or in person) | $530.00 Flat Fee for first hour (all conferences will be charged for minimum of 1 hour) |
| | $135.00 Flat Fee per each additional 15-minute increment |
| Deposition* | $650.00 Flat Fee for first hour (minimum of 1 hour) |
| | $185.00 Flat Fee per 15-minute increments |
| Court Apperances+ | $1,050.00 Flat Fee for first hour (minimum of 1 hour) |
| | $160.00 Flat Fee per 15-minute increments |
| Independent Medical Examination (IME)# | $825.00 Flat Fee per patient assessment (not including record review) |
| Travel Time (Special rate for IME) | $275.00 per hour |
| Travel Time | $550.00 per hour |
| | $1,720.00 Flat Fee to be charged per day if travel is required the day before or after the engagement, plus accommodation expenses will be charged |
| Travel Cancelation Fee | $2,060.00 Flat Fee will be billed for cancelation with less than 48-hour notice |
| Retainer - Refundable; First Invoice | $2,750.00 refundable retainer will be required in advance, prior to initiation of any services, applicable to the first invoice.  Any unused portion of retainers shall be returned. |

*Fees are due on the same day of event before any testimony is given.

+Estimated fees for reserved time are prepaid at least one week prior to scheduled event; any difference in estimated time and actual time spent will be  invoiced immediately and shall be due and payable upon receipt. Any and all outstanding invoices must be fully paid before any testimony is to be provided.

# Dr. Carson does not provide office space for exam. Exams can be performed at any setting that affords privacy. No equipment required.

PLUS air travel, meals, accommodations, ground transportation and other related expenses to be billed.

Counsel retaining expert bears responsibility for invoiced differences between actual time and fee schedule minimum charge time with regard to opposing counsel deposition fees.

1.  A replenishable deposit/retainer may be required in advance prior to initiation of any services.

2.  A case initiation fee of **$295.00** payable to FGI is required and will be reflected on the first invoice.

3.  Client agrees not to designate Expert in court papers until Expert's express permission is obtained.  Notwithstanding lack of execution of this Contract, Client agrees that commencement of work by Expert, at Client's direction, constitutes retention of Expert under the terms and conditions of this Contract.

FG-05-1

**EXHIBIT D**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

VANESSA NEWPORT,

       *Plaintiff,*

v.                                  Case No.: 6:18-cv-Orl-18GJK

FRONTIER AIRLINES, INC.,          District Judge G. Kendall Sharp
                                     Magistrate Judge Gregory J. Kelly

       *Defendant.*

_____/

## <u>JOINT PROPOSED JURY INSTRUCTIONS</u>

Plaintiff VANESSA NEWPORT ("Plaintiff") and Defendant FRONTIER AIRLINES, INC. ("Defendant"), each by their undersigned counsel, pursuant to this Court's Case Management and Scheduling Order (Doc. #15) and Middle District of Florida Rule 3.06, submit the following Joint Proposed Jury Instructions. These instructions are adopted from the Eleventh Circuit Civil Pattern Jury Instructions and the Florida Standard Jury Instructions.

1.      General Preliminary Instruction

2.      Jury Questions

3.      Interim Statements

4.      Stipulations

5.      Use of Depositions

6.      Judicial Notice

7.      Use of Interrogatories

8.      Instruction for Documentary, Photographic, or Physical Evidence

9.      Instruction when Evidence is First Published to Jurors

*Page 1 of 38*

EXHIBIT E

10.     Instruction Regarding Visual or Demonstrative Aids

11.     Introduction

12.     Consideration of Direct and Circumstantial Evidence; Argument of Counsel; Comments by the Court

13.     Credibility of Witnesses

14.     Impeachment of Witnesses because of Inconsistent Statements

15.     Expert Witnesses

16.     Responsibility for Proof – Plaintiff's Claim – Preponderance of the Evidence

17.     Summary of Claim

18.     Greater Weight of Evidence

19.     Negligence

20.     Negligence of a Common Carrier

21.     Legal Cause

22.     Issues on Plaintiff's Claim – Common Carrier

23.     Burden of Proof on Main Claim

24.     Defense Issues

25.     Burden of Proof on Defense Issues

26.     Personal Injury – Introduction

27.     Personal Injury – Elements

28.     Duty to Deliberate when only the Plaintiff Claims Damages

29.     Duty to Follow Instructions – Corporate Party Involved

30.     Election of Foreperson Explanation of Verdict Form

*Page 2 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 1 – General Preliminary Instruction**

Members of the Jury:

Now that you've been sworn, I need to explain some basic principles about a civil trial and your duty as jurors. These are preliminary instructions. I'll give you more detailed instructions at the end of the trial.

The jury's duty:

It's your duty to listen to the evidence, decide what happened, and apply the law to the facts. It's my job to provide you with the law you must apply – and you must follow the law even if you disagree with it.

What is evidence:

You must decide the case on only the evidence presented in the courtroom. Evidence comes in many forms. It can be testimony about what someone saw, heard, or smelled. It can be an exhibit or a photograph. It can be someone's opinion.

Some evidence may prove a fact indirectly. Let's say a witness saw wet grass outside and people walking into the courthouse carrying wet umbrellas. This may be indirect evidence that it rained, even though the witness didn't personally see it rain. Indirect evidence like this is also called "circumstantial evidence" – simply a chain of circumstances that likely proves a fact.

As far as the law is concerned, it makes no difference whether evidence is direct or indirect. You may choose to believe or disbelieve either kind. Your job is to give each piece of evidence whatever weight you think it deserves.

What is not evidence:

During the trial, you'll hear certain things that are not evidence and you must not consider them.

EXHIBIT E

First, the lawyers' statements and arguments are not evidence. In their opening statements and closing arguments, the lawyers will discuss the case. Their remarks may help you follow each side's arguments and presentation of evidence. But the remarks themselves are not evidence and should not play a role in your deliberations.

Second, the lawyers' questions and objections are not evidence. Only the witnesses' answers are evidence. Do not decide that something is true just because a lawyer's question suggests that it is. For example, a lawyer may ask a witness, "You saw Mr. Jones hit his sister, didn't you?" That question is not evidence of what the witness saw or what Mr. Jones did – unless the witness agrees with it.

There are rules of evidence that control what the court can receive into evidence. When a lawyer asks a witness a question or presents an exhibit, the opposing lawyer may object if [he/she] thinks the rules of evidence do not permit it. If I overrule the objection, then the witness may answer the question or the court may receive the exhibit. If I sustain the objection, then the witness cannot answer the question, and the court cannot receive the exhibit. When I sustain an objection to a question, you must ignore the question and not guess what the answer might have been.

Sometimes I may disallow evidence – this is also called "striking" evidence – and order you to disregard or ignore it. That means that you must not consider that evidence when you are deciding the case.

I may allow some evidence for only a limited purpose. When I instruct you that I have admitted an item of evidence for a limited purpose, you must consider it for only that purpose and no other.

*Page 4 of 38*

EXHIBIT E

<u>Credibility of witnesses</u>:

To reach a verdict, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of it, or none of it. When considering a witness's testimony, you may take into account:

· the witness's opportunity and ability to see, hear, or know the things the witness is testifying about;

· the witness's memory;

· the witness's manner while testifying;

· any interest the witness has in the outcome of the case;

· any bias or prejudice the witness may have;

· any other evidence that contradicts the witness's testimony;

· the reasonableness of the witness's testimony in light of all the evidence; and

· any other factors affecting believability.

At the end of the trial, I'll give you additional guidelines for determining a witness's credibility.

<u>Description of the case</u>:

This is a civil case. To help you follow the evidence, I'll summarize the parties' positions. Plaintiff Vanessa Newport claims Defendant Frontier Airlines was negligent in the manner in which it served her hot tea. Specifically, Frontier served Plaintiff a cup of hot water closed with a lid and a teabag and sugar on the side. Frontier denies it was negligent in the manner in which it served her hot tea. Frontier also claims that Plaintiff caused her own alleged injuries by spilling the cup of hot water on herself.

*Page 5 of 38*

EXHIBIT E

<u>Burden of proof</u>:

Vanessa Newport has the burden of proving her case by what the law calls a "preponderance of the evidence." That means Vanessa Newport must prove that, in light of all the evidence, what she claims is more likely true than not. So, if you could put the evidence favoring Vanessa Newport and the evidence favoring Frontier Airlines, Inc. on opposite sides of balancing scales, Vanessa Newport needs to make the scales tip to her side. If Vanessa Newport fails to meet this burden, you must find in favor of Frontier Airlines, Inc.

To decide whether any fact has been proved by a preponderance of the evidence, you may – unless I instruct you otherwise – consider the testimony of all witnesses, regardless of who called them, and all exhibits that the court allowed, regardless of who produced them. After considering all the evidence, if you decide a claim or fact is more likely true than not, then the claim or fact has been proved by a preponderance of the evidence.

<u>Conduct of the jury</u>:

While serving on the jury, you may not talk with anyone about anything related to the case. You may tell people that you are a juror and give them information about when you must be in court. But you must not discuss anything about the case itself with anyone.

You should not even talk about the case with each other until you begin your deliberations. You want to make sure you have heard everything – all the evidence, the lawyers' closing arguments, and my instructions on the law – before you begin deliberating. You should keep an open mind until the end of the trial. Premature discussions may lead to a premature decision.

In this age of technology, I want to emphasize that in addition to not talking face-to-face with anyone about the case, you must not communicate with anyone about the case by any other

EXHIBIT E

means. This includes e-mails, text messages, and the Internet, including social-networking websites such as Facebook and Twitter.

You also should not Google or search online or offline for any information about the case, the parties, or the law. Do not read or listen to the news about this case, visit any places related to this case, or research any fact, issue, or law related to this case. The law forbids the jurors to talk with anyone else about the case and forbids anyone else to talk to the jurors about it. It is very important that you understand why these rules exist and why they are so important. You must base your decision only on the testimony and other evidence presented in the courtroom. It is not fair to the parties if you base your decision in any way on information you acquire outside the courtroom. For example, the law often uses words and phrases in special ways, so it is important that any definitions you hear come only from me and not from any other source. Only you jurors can decide a verdict in this case. The law sees only you as fair, and only you have promised to be fair – no one else is so qualified.

Taking notes:

If you wish, you may take notes to help you remember what the witnesses said. If you do take notes, please do not share them with anyone until you go to the jury room to decide the case. Do not let note-taking distract you from carefully listening to and observing the witnesses. When you leave the courtroom, you should leave your notes hidden from view in the jury room.

Whether or not you take notes, you should rely on your own memory of the testimony. Your notes are there only to help your memory. They are not entitled to greater weight than your memory or impression about the testimony.

EXHIBIT E

<u>Course of the trial</u>:

Let's walk through the trial. First, each side may make an opening statement, but they do not have to. Remember, an opening statement is not evidence, and it is not supposed to be argumentative; it is just an outline of what that party intends to prove.

Next, Vanessa Newport will present her witnesses and ask them questions. After Vanessa Newport questions the witness, Frontier Airlines, Inc. may ask the witness questions – this is called "cross-examining" the witness. Then Frontier Airlines, Inc. will present its witnesses, and Vanessa Newport may cross-examine them. You should base your decision on all the evidence, regardless of which party presented it.

After all the evidence is in, the parties' lawyers will present their closing arguments to summarize and interpret the evidence for you, and then I'll give you instructions on the law.

You'll then go to the jury room to deliberate.

**Eleventh Circuit Pattern Jury Instruction No. 1.1**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 2 – Jury Questions**

During this trial, you may submit questions to a witness after the lawyers have finished their own questioning. Here is how the procedure works: After each witness has testified, and the lawyers have asked all of their questions, I'll ask if any of you have questions. If you have a question, write it down and give it to the court staff.

You may submit a question for a witness only to clarify an answer or to help you understand the evidence. Our experience with juror questions indicates that jurors rarely have more than a few questions for any one witness, and there may be no questions at all for some witnesses.

If you submit a question, the court staff will give it to me and I'll share your questions with the lawyers in the case. If the rules of evidence allow your question, one of the lawyers or I will read your question to the witness. I may modify the form or phrasing of a question so that it's allowed under the evidence rules. Sometimes, I may not allow the questions to be read to the witness, either because the law does not allow it or because another witness is in a better position to answer the question. If I can't allow the witness to answer a question, you must not draw any conclusions from that fact or speculate on what the answer might have been.

Here are several important things to keep in mind about your questions for the witnesses:

· First, you must submit all questions in writing. Please don't ask any questions aloud.

· Second, the court can't re-call witnesses to the stand for additional juror questions. If you have a question for a particular witness, you must submit it when I ask.

· Finally, because you should remain neutral and open-minded throughout the trial, you should phrase your questions in a way that doesn't express an opinion about the case or a witness. You must keep an open mind until you've heard all the evidence, the closing arguments, and my final instructions on the law.

*Page 9 of 38*

EXHIBIT E

**Eleventh Circuit Pattern Jury Instruction No. 1.4**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 3 – Interim Statements**

At times during the trial, the lawyers will address you. You'll soon hear the lawyers' opening statements, and at the trial's conclusion you'll hear their closing arguments. Sometimes the lawyers may choose to make short statements to you, either to preview upcoming evidence or to summarize and highlight evidence they just presented. These statements and arguments are the lawyers' views of the evidence or of what they anticipate the evidence will be. They are not evidence themselves.

**Eleventh Circuit Pattern Jury Instruction No. 1.5**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 4 – Stipulations**

Sometimes the parties have agreed that certain facts are true. This agreement is called a stipulation. You must treat these facts as proved for this case.

**Eleventh Circuit Pattern Jury Instruction No. 2.1**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 5 – Use of Depositions**

A deposition is a witness's sworn testimony that is taken before the trial. During a deposition, the witness is under oath and swears to tell the truth, and the lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

The deposition of [name of witness], taken on [date], [is about to be/has been] presented to you [by a video/by reading the transcript]. Deposition testimony is entitled to the same consideration as live testimony, and you must judge it in the same way as if the witness was testifying in court.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

**Eleventh Circuit Pattern Jury Instruction No. 2.2**

Accepted _____

Rejected _____

*Page 13 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 6 – Judicial Notice**

The rules of evidence allow me to accept facts that no one can reasonably dispute. The law calls this "judicial notice." I've accepted [state the fact that the court has judicially noticed] as proved even though no one introduced evidence to prove it. You must accept it as true for this case.

**Eleventh Circuit Pattern Jury Instruction No. 2.5**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 7 – Use of Interrogatories**

[You'll now hear/You've heard] answers that [name of party] gave in response to written questions the other side submitted. The questions are called "interrogatories." Before the trial, [name of party] gave the answers in writing while under oath.

You must consider [name of party]'s answers to as though [name of party] gave the answers on the witness stand.

**Eleventh Circuit Pattern Jury Instruction No. 2.6**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 8 –**
**Instruction When First Item of Documentary,**
**Photographic, or Physical Evidence is Admitted**

The [describe item of evidence] has now been received in evidence. Witnesses may testify about or refer to this or any other item of evidence during the remainder of the trial. This and all other items received in evidence will be available to you for examination during your deliberations at the end of the trial.

**Florida Standard Jury Instruction No. 301.2**

Accepted _____

Rejected _____

*Page 16 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 9 –**
**Instruction when Evidence is First Published to Jurors**

The [describe item of evidence] has been received in evidence. It is being shown to you now to help you understand the testimony of this witness and other witnesses in the case, as well as the evidence as a whole. You may examine [describe item of evidence] briefly now. It will also be available to you for examination during your deliberations at the end of the trial.

**Florida Standard Jury Instruction No. 301.3**

Accepted _____

Rejected _____

EXHIBIT E

## PROPOSED JURY INSTRUCTION NO. 10 –
## Instruction Regarding Visual or Demonstrative Aids

*a.   Generally:*

This witness will be using [identify demonstrative or visual aid(s)] to assist in explaining or illustrating [his] [her] testimony. The testimony of the witness is evidence; however, [this] [these] [identify demonstrative or visual aid(s)] [is] [are] not to be considered as evidence in the case unless received in evidence, and should not be used as a substitute for evidence. Only items received in evidence will be available to you for consideration during your deliberations.

*b.   Specially created visual or demonstrative aids based on disputed assumptions:*

This witness will be using [identify demonstrative aid(s)] to assist in explaining or illustrating [his] [her] testimony. [This] [These] item[s] [has] [have] been prepared to assist this witness in explaining [his] [her] testimony. [It] [They] may be based on assumptions which you are free to accept or reject. The testimony of the witness is evidence; however, [this] [these] [identify demonstrative or visual aid(s)] [is] [are] not to be considered as evidence in the case unless received in evidence, and should not be used as a substitute for evidence. Only items received in evidence will be available to you for consideration during your deliberations.

**Florida Standard Jury Instruction No. 301.4**

Accepted _____

Rejected _____

*Page 18 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 11 – Introduction**

Members of the jury, you have now heard and received all of the evidence in this case. I am now going to tell you about the rules of law that you must use in reaching your verdict. When I finish telling you about the rules of law, the attorneys will present their final arguments and you will then retire to decide your verdict.

In deciding this case, it is your duty as jurors to decide the issues, and only those issues, that I submit for your determination. You must come to an agreement about what your answers will be. Your agreed-upon answers to my questions are called your jury verdict.

The evidence in this case consists of the sworn testimony of the witnesses, all exhibits received in evidence and all facts that were admitted or agreed to by the parties.

In reaching your verdict, you must think about and weigh the testimony and any documents, photographs, or other material that has been received in evidence. You may also consider any facts that were admitted or agreed to by the lawyers. Your job is to determine what the facts are. You may use reason and common sense to reach conclusions. You may draw reasonable inferences from the evidence. But you should not guess about things that

**Florida Standard Jury Instruction Nos. 401.1 and 601.1**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 12 –**
**Consideration of Direct and Circumstantial Evidence;**
**Argument of Counsel; Comments by the Court**

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But, anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

**Eleventh Circuit Pattern Jury Instruction No. 3.3**

Accepted _____

Rejected _____

*Page 20 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 13 – Credibility of Witnesses**

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

1.    Did the witness impress you as one who was telling the truth?

2.    Did the witness have any particular reason not to tell the truth?

3.    Did the witness have a personal interest in the outcome of the case?

4.    Did the witness seem to have a good memory?

5.    Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

6.    Did the witness appear to understand the questions clearly and answer them directly?

7.    Did the witness's testimony differ from other testimony or other evidence?

**Eleventh Circuit Pattern Jury Instruction No. 3.4**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 14 –**
**Impeachment of Witnesses Because of Inconsistent Statements**

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

**Eleventh Circuit Pattern Jury Instruction No. 3.5.1**

Accepted _____

Rejected _____

*Page 22 of 38*

EXHIBIT E

## PROPOSED JURY INSTRUCTION NO. 15 – Expert Witness

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

**Eleventh Circuit Pattern Jury Instruction No. 3.6.1**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 16 –**
**Responsibility for Proof – Plaintiff's Claim[s], Cross Claims, Counterclaims –**
**Preponderance of the Evidence**

In this case it is the responsibility of the Plaintiff to prove every essential part of her claims by a "preponderance of the evidence." This is sometimes called the "burden of proof" or the "burden of persuasion."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that the Plaintiff's claim is more likely true than not true.

If the proof fails to establish any essential part of a claim or contention by a preponderance of the evidence, you should find against the Plaintiff.

In deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of the Plaintiff's claim by a preponderance of the evidence, you should find for the Defendant as to that claim.

**Eleventh Circuit Pattern Jury Instruction No. 3.7.1**

Accepted _____

Rejected _____

*Page 24 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 17 – Summary of Claim**

The claims and defenses in this case are as follows. Plaintiff claims Defendant Frontier Airlines was negligent in the manner in which it served her hot tea. Specifically, Frontier served Plaintiff a cup of hot water closed with a lid and a teabag and sugar on the side.  Frontier denies it was negligent in the manner in which it served her hot tea, and also claims that Plaintiff was negligent herself, and caused her own alleged injuries, by spilling the cup of hot water on herself. Plaintiff must prove her claim by the greater weight of the evidence. I will now define some of the terms you will use in deciding this case.

**Florida Standard Jury Instruction No. 401.2**

Accepted _____

Rejected _____

*Page 25 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 18 – Greater Weight of the Evidence**

"Greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case.

**Florida Standard Jury Instruction No. 401.3**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 19 – Negligence**

Negligence is the failure to use reasonable care, which is the care that a reasonably careful person would use under like circumstances. Negligence is doing something that a reasonably careful person would not do under like circumstances or failing to do something that a reasonably careful person would do under like circumstances.

**Florida Standard Jury Instruction No. 401.4**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 20 – Negligence of a Common Carrier**

Negligence is the failure to use reasonable care. Frontier Airlines, Inc. is a common carrier. The reasonable care required of Frontier Airlines, Inc. is different from the reasonable care required of a passenger.

The reasonable care required of a common carrier for the safety of a passenger is the highest degree of care that is consistent with the type of transportation used and the practical operation of the business of a common carrier of passengers. Negligence of a common carrier is doing something that a very careful person would not do under like circumstances or failing to do something that a very careful person would do under like circumstances.

**Florida Standard Jury Instruction No. 401.6**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 21 – Legal Cause**

a. *Legal cause generally:*

Negligence is a legal cause of injury if it directly and in natural and continuous sequence produces or contributes substantially to producing such injury, so that it can reasonably be said that, but for the negligence, the injury would not have occurred.

b. *Concurring cause:*

In order to be regarded as a legal cause of injury, negligence need not be the only cause. Negligence may be a legal cause of injury even though it operates in combination with the act of another, or some natural cause if the negligence contributes substantially to producing such injury.

c. *Intervening cause:*

Negligence may also be a legal cause of injury even though it operates in combination with the act of another or some natural cause occurring after the negligence occurs if [such other cause was itself reasonably foreseeable and the negligence contributes substantially to producing such injury] [or] [the resulting injury was a reasonably foreseeable consequence of the negligence and the negligence contributes substantially to producing it].

**Florida Standard Jury Instruction No. 401.12**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 22 –**
**Issues on Plaintiff's Claim – Common Carrier**

The issue on Plaintiff's claim for you to decide is: whether Defendant in serving Plaintiff a cup of hot water closed with a lid and a teabag and sugar on the side failed to exercise the highest degree of care for the safety of Plaintiff; and, if so, whether that failure was a legal cause of the injury to Plaintiff.

**Florida Standard Jury Instruction No. 401.19**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 23 – Burden of Proof on Main Claim**

If the greater weight of the evidence does not support Plaintiff's claim, your verdict should be for Defendant.

**Florida Standard Jury Instruction No. 401.21**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 24 – Defense Issues**

If, however, the greater weight of the evidence supports Plaintiff's claim against Defendant, then you should consider the defenses raised by Defendant.

Defendant claims that Plaintiff was negligent in handling the cup of hot water, and that she was the sole proximate cause of her alleged injuries. The issue for you to decide is whether Plaintiff was herself negligent in handling the cup of hot water, and, if so, whether that negligence was a contributing legal cause of injury or damage to Plaintiff.

**Florida Standard Jury Instruction No. 401.22**

Accepted _____

Rejected _____

*Page 32 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 25 – Burden of Proof on Defense Issues**

If the greater weight of the evidence does not support Defendant's defenses and the greater weight of the evidence does support Plaintiff's claim, then your verdict should be for Plaintiff in the total amount of her damages.  If, however, the greater weight of the evidence shows that both Plaintiff and Defendant were negligent and that the negligence of each contributed as a legal cause of injury sustained by Plaintiff, you should decide and write on the verdict form what percentage of the total negligence of both parties to this action you apportion to each of them.

**Florida Standard Jury Instruction No. 401.23**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 26 – Personal Injury – Introduction**

If your verdict is for Defendant, you will not consider the matter of damages. But if the greater weight of the evidence supports Plaintiff's claim, you should determine and write on the verdict form, in dollars, the total amount of injury which the greater weight of the evidence shows will fairly and adequately compensate her for her injury, including any damages that Plaintiff is reasonably certain to incur or experience in the future. You shall consider the following elements:

**Florida Standard Jury Instruction No. 501.1**

Accepted _____

Rejected _____

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 27 – Personal Injury – Elements**

a.      *Injury, pain, disability, disfigurement, loss of capacity for enjoyment of life:*

Any bodily injury sustained by Vanessa Newport and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconvenience, or loss of capacity for the enjoyment of life experienced in the past or to be experienced in the future. There is no exact standard for measuring such damage. The amount should be fair and just in the light of the evidence.

b.      *Medical expenses: care and treatment of Plaintiff:*

The reasonable expense of medical care and treatment necessarily or reasonably obtained by Vanessa Newport in the past.


**ANNOTATIONS AND COMMENTS:**

**Defendant objects to including "disability or physical impairment, [] mental anguish, [], or loss of capacity for the enjoyment of life experienced in the past or to be experienced in the future."**

**Plaintiff disagrees with Defendant and notes that these phrases are part of the Standard Jury Instruction.**

**Florida Standard Jury Instruction No. 501.2**

Accepted _____

Rejected _____

*Page 35 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 28 –**
**Duty to Deliberate When Only the Plaintiff Claims Damages**

Of course, the fact that I have given you instructions concerning the issue of Plaintiff's damages should not be interpreted in any way as an indication that I believe that the Plaintiff should, or should not, prevail in this case.

Your verdict must be unanimous – in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

**Eleventh Circuit Pattern Jury Instruction No. 3.8.1**

Accepted _____

Rejected _____

*Page 36 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 29 –**
**The Duty to Follow Instructions – Corporate Party Involved**

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

The fact that a corporation is involved as a party must not affect your decision in any way. A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.

**Eleventh Circuit Pattern Jury Instruction No. 3.2.2**

Accepted _____

Rejected _____

*Page 37 of 38*

EXHIBIT E

**PROPOSED JURY INSTRUCTION NO. 30 –**
**Closing Instructions**

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.

A verdict form has been prepared for your convenience.

[Explain verdict]

Take the verdict form with you to the jury room. When you've all agreed on the verdict, your foreperson must fill in the form, sign it and date it. Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me and I'll respond as promptly as possible – either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.

You may now retire to decide your verdict.

**Eleventh Circuit Pattern Jury Instruction No. 3.9**

Accepted _____

Rejected _____

EXHIBIT E

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

VANESSA NEWPORT,

        *Plaintiff,*

v.                                                                Case No.: 6:18-cv-Orl-18GJK

FRONTIER AIRLINES, INC.,                        District Judge G. Kendall Sharp
                                                                  Magistrate Judge Gregory J. Kelly

        *Defendant.*

_____/

**<u>JOINT PROPOSED VERDICT FORM</u>**

We, the jury, return the following verdict:

1.     Was there negligence on the part of Defendant Frontier Airlines, Inc. which was a legal cause of injury to Plaintiff Vanessa Newport?

        YES _____          NO _____

If your answer to question 1 is NO, your verdict is for defendant, and you should not proceed further except to date and sign this verdict form and return it to the courtroom. If your answer to question 1 is YES, please answer question 2.

2.     Was there negligence on the part of Plaintiff Vanessa Newport which was a legal cause of her injury?

        YES _____          NO _____

Please answer question 3.

3.     State the percentage of any negligence, which was a legal cause of injury to Plaintiff Vanessa Newport that you charge to:

Defendant                                        _____%
Frontier Airlines, Inc.

Plaintiff                                           _____%

**EXHIBIT F**

Vanessa Newport

Total must be 100%

Note: For any response of "NO" to question 1 or 2, place a zero as to that person or entity in answering question 3.

In determining the amount of damages, do not make any reduction because of the negligence, if any, of Plaintiff Vanessa Newport. If you find that Plaintiff Vanessa Newport was negligent, the court in entering judgment will make an appropriate reduction in the damages awarded.

Please answer questions 4 and 5.

4.    What is the total amount of Plaintiff Vanessa Newport's damages for medical expenses incurred in the past?

$ _____

5.    What is the total amount of Plaintiff Vanessa Newport's damages for pain and suffering, physical impairment, and disfigurement sustained in the past and to be sustained in the future?

$ _____

TOTAL DAMAGES OF
Plaintiff Vanessa Newport
(add lines 4 and 5)

$ _____

**SO SAY WE ALL, this _____ day of October, 2019.**

_____
**FOREPERSON**

**EXHIBIT F**